Willie **MILLER**, Appellant,

v.

**UNITED STATES, Appellee.**

**Nos. 80–430, 82–1046.**

District of Columbia Court of Appeals.

Argued Nov. 8, 1983.

Decided June 29, 1984.

Andrew L. Lipps, Public Defender Service, Washington, D.C., at the time the briefs were filed, with whom Silas J. Wasserstrom, Public Defender Service, Washington, D.C., at the time the briefs were filed, was on the briefs, for appellant in No. 80–430.

Scott Howe, Public Defender Service, Washington, D.C., with whom A. Franklin Burgess, Jr., Public Defender Service, Washington, D.C., at the time the briefs were filed, was on the briefs, for appellant in No. 82–1046.

J. Alvin Stout, III, Asst. U.S. Atty., Washington, D.C., with whom Charles F.C. Ruff, U.S. Atty., Washington, D.C., at the time the brief was filed, John A. Terry, Asst. U.S. Atty., Washington, D.C., at the time the brief was filed, and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee in No. 80–430.

G. William Currier, Asst. U.S. Atty., Washington, D.C., with whom Stanley S.

Harris, U.S. Atty., Washington, D.C., at the time the brief was filed, Michael W. Farrell and Wendy Bebie, Washington, D.C., were on the brief, for appellee in No. 82–1046.

Before BELSON, Associate Judge, and PAIR and KERN,* Associate Judges, Retired.

BELSON, Associate Judge:

Appellant Willie Miller was convicted of first-degree murder but acquitted of carrying a pistol without a license in connection with the fatal shooting of Michael Bottoms. He appeals both from the judgment of conviction and from the trial court's denial without a hearing of his subsequent motion to vacate sentence. Although we reject the arguments advanced on the direct appeal, we conclude that the trial court erred in denying a hearing on the motion to vacate. Accordingly, we remand to the trial court for a hearing on appellant's claim that he was denied his Sixth Amendment right to the effective assistance of counsel.

### I

Michael Bottoms died of multiple gunshot wounds of the head, neck, and chest. Examination of bullet fragments recovered from his body showed that the shots had been fired from at least two different weapons. The government presented alternate theories to the jury: either appellant himself fired one of the guns used in killing Bottoms, or he aided and abetted his brother in the murder. Appellant contends that the evidence was insufficient to support his conviction either as a principal or as an aider and abettor. We conclude that the evidence was sufficient to convict appellant on either theory.

■ In assessing appellant's claim, we must view the evidence in the light most favorable to the government and must give the government the benefit of all reasonable inferences. *Hooks v. United States*,

373 A.2d 909, 912 (D.C.1977); *Calhoun v. United States*, 369 A.2d 605, 607 (D.C. 1977). Judged by these standards, the evidence showed the following. Appellant Willie Miller was robbed by a man armed with a pistol supplied by the decedent, Michael Bottoms. Appellant then returned to his nearby home. A short time later, his older brother, Michael Miller, left the house in haste. Michael confronted Donnie Rose, who earlier had been with appellant's assailant, and angrily demanded to know who had robbed his brother. Michael Miller then spoke to a Joseph Morris, telling him that whoever had robbed his brother "wasn't going to get away with it" and that he was going to "straighten out what happened." Morris handed Michael a paper bag containing a hand gun. Meanwhile, appellant had re-emerged from his home and was overheard telling his brother who had robbed him.

Michael Miller approached Bottoms and questioned him about the robbery. Michael then left, but returned soon after, accompanied by appellant and a third person. Michael again grilled Bottoms about the incident. He then took a gun out of the paper bag and fired at Bottoms. When the first shot missed, Bottoms ran. Michael chased him. One witness, Jasper Hoskins, testified that while Michael was questioning Bottoms, appellant was only 8 to 10 feet away. Powell confirmed that shots came from the area where appellant was standing. Powell also testified that he saw appellant's right arm extended in front of him holding what appeared to be a revolver.

After Bottoms was struck down, Michael Miller came up and fired several more shots into him at close range. The Miller brothers and the unidentified third person then ran off together. As we noted above, the government introduced evidence that Bottoms was struck by bullets from at least two guns.

---

* Judge Kern was an Associate Judge at the time of argument. His status changed to Associate Judge, Retired, on May 25, 1984.

■ Appellant argues that since the jury acquitted him of carrying a pistol without a license, it necessarily found that he was not guilty as a principal. This is incorrect, for inconsistent jury verdicts are permissible. *Hamling v. United States,* 418 U.S. 87, 101, 94 S.Ct. 2887, 2899, 41 L.Ed.2d 590 (1974); *United States v. Dotterweich,* 320 U.S. 277, 279, 64 S.Ct. 134, 135, 88 L.Ed. 48 (1943); *Steadman v. United States,* 358 A.2d 329, 332 (D.C.1976). In *Steadman,* as in this case, the defendant was accused of a fatal shooting. This court upheld the defendant's manslaughter conviction even though the defendant was acquitted of carrying a pistol without a license. The only question, the court said, was "whether the evidence was sufficient to support the conviction under the guilty verdict." *Id.* (citing *Branch v. United States,* 263 A.2d 258, 259 (D.C.1970)).

■ We hold that the evidence in this case was sufficient to support appellant's conviction as a principal. There was evidence suggesting that decedent Bottoms had aided the man who had robbed appellant. Appellant's brother, after discussions with appellant, clearly believed that Bottoms was involved. Two witnesses placed appellant close by when his brother shot Bottoms and testified as well that shots came from the area where appellant was standing. One of these witnesses saw appellant's arm outstretched, apparently in a firing position. Ballistics evidence showed that more than one gun was involved in the shooting. Finally, appellant fled the scene with his brother.

■ Even if appellant were able to argue persuasively that the evidence did not support his conviction as a principal, he would still have to meet the contention that the jury could have found him guilty as an aider and abettor. As we said in *Creek v. United States,* 324 A.2d 688, 689 (D.C. 1974) (per curiam) (quoting *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir.1938) (L. Hand, J.)), "[a]iding and abetting is established if the accused '... in some sort associated himself with the venture ...

participated in it as in something that he wished to bring about, [and] ... [sought] by his action to make it succeed.' " While presence at the scene of the crime cannot alone prove criminal complicity, it may nevertheless constitute aiding and abetting if by design it encourages the perpetrator or facilitates the crime. *Id.*

■ In this case, the evidence was not simply that appellant happened to be at the scene of the crime. As recounted above, he had been robbed by a person armed with a gun supplied by the decedent. He went into his home and soon thereafter his brother emerged in anger to seek out appellant's assailant. The brother first confronted Bottoms alone, left, and came back soon after with appellant and a third person. This time the brother drew the gun and fired at Bottoms. The two brothers and the third person then fled together. The jury could infer from this evidence that appellant had encouraged this retaliatory attack on Bottoms and had sought by his presence to make it succeed. *See Creek, supra,* 324 A.2d at 689–90; *In re T.J.W.,* 294 A.2d 174, 176–77 (D.C.1972). We thus conclude that the evidence was sufficient to support appellant's conviction for first-degree murder either as a principal or as an aider and abettor.

## II

Appellant's second contention on his direct appeal is that the delay of 13 months between his arrest and trial violated his Sixth Amendment right to a speedy trial. We reject this contention as well.

■ In reviewing a speedy trial claim, this court must evaluate four factors: the length of the delay, the reason for the delay, the defendant's assertion of his right, and the prejudice to the defendant. *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972). As to the first factor, because here the period between arrest and trial was longer than a year, the government has the burden of establishing that appellant's right to a

speedy trial was not violated. *Parks v. United States,* 451 A.2d 591, 600 (D.C. 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 2123, 77 L.Ed.2d 1303 (1983); *Asbell v. United States,* 436 A.2d 804, 812 (D.C. 1981); *United States v. Bolden,* 381 A.2d 624, 627 (D.C.1977).

■ The record shows that almost all of the delay in this case was caused simply by court congestion and ordinary institutional factors. Appellant was arrested on November 12, 1978. The 3½ month delay between that date and the filing of the indictment was due to preliminary hearings and investigation. Trial was initially set for July 30, 1979, but had to be postponed because the judge to whom the case was assigned was then in trial on another case. The next available trial date was December 3, 1979, but trial was continued to December 12, 1979, on motion of appellant's codefendant. Thus, while virtually the entire delay in this case is chargeable to the government, it was the kind of "neutral" delay that we weigh less heavily against the government than either deliberate delay to secure a tactical advantage, *Barker, supra,* 407 U.S. at 531, 92 S.Ct. at 2192; *Williams v. United States,* 421 A.2d 19, 27 (D.C.1980), or "significant" delay caused by prosecution failure to take reasonable means to bring the case to trial, *Day v. United States,* 390 A.2d 957, 967–69 (D.C. 1978).

Appellant did not formally assert his right to a speedy trial until November 6, 1979, when he moved to join the speedy trial motion previously filed by his codefendant. This was almost a year after arrest and only a little more than a month before trial. This court has held that where most of the delay occurs before an accused demands a speedy trial it is to be accorded less significance. *Shreeves v. United States,* 395 A.2d 774, 784 (D.C. 1978), *cert. denied,* 441 U.S. 943, 99 S.Ct. 2161, 60 L.Ed.2d 1045 (1979). *See Strickland v. United States,* 389 A.2d 1325, 1331 (D.C.1978), *cert. denied,* 440 U.S. 926, 99 S.Ct. 1258, 59 L.Ed.2d 481 (1979) (late as-

sertion preserves the right but does not weigh heavily in defendant's favor).

Appellant contends that he should be deemed to have asserted his speedy trial right earlier in this case because he was incarcerated while awaiting trial and because he "repeatedly" moved for release pending trial. As discussed below, appellant was incarcerated on the charges in this case for 8 of the 13 months between arrest and trial. The record reveals that appellant filed a written motion for release on April 18, 1979, approximately 5 months after arrest, and made an oral motion for review of conditions of release in May 1979. He was released to third-party custody on December 21, 1978; it is unclear whether this action was a response to a motion by appellant.

■ Our cases indicate that an accused who is incarcerated or who has filed motions for release will be deemed to have asserted his right to a speedy trial. *See, e.g., Tribble v. United States,* 447 A.2d 766, 769–70 (D.C.1982); *Strickland, supra,* 389 A.2d at 1331; *Branch v. United States,* 372 A.2d 998, 1002 (D.C.1977). These holdings were extensions of the Supreme Court's holding in *Barker v. Wingo, supra,* 407 U.S. at 528, 92 S.Ct. at 2191, that the speedy trial right is not waived merely because a defendant fails to assert it. *Barker* also held, however, that courts should weigh the frequency and force of the defendant's objections to delay. *Id.* at 528–29, 92 S.Ct. at 2191–92. This court has followed that teaching by ascribing less weight, for example, to a motion for dismissal not accompanied by an alternative motion for immediate trial, *Bethea v. United States,* 395 A.2d 787, 792 (D.C.1978); *United States v. Bolden, supra,* 381 A.2d at 628, to objections to continuances not accompanied by a formal motion, *Reed v. United States,* 383 A.2d 316, 319 (D.C.), *cert. denied,* 439 U.S. 871, 99 S.Ct. 203, 58 L.Ed.2d 183 (1978), and to the implicit assertion by virtue of incarceration, *see Smith v. United States,* 379 A.2d 1166, 1167 (D.C.1977); *Strickland, supra,* 389

A.2d at 1331. Accordingly, in this case we conclude that the fact of incarceration and the motions for release lend some additional weight to appellant's formal speedy trial motion, but do not amount to a strong indication that appellant wished a speedy trial. *See Barker, supra,* 407 U.S. at 536, 92 S.Ct. at 2195.

■ The last factor, prejudice to the accused, is assessed in light of the interests of defendants that the speedy trial right was designed to protect. Those are: (1) preventing oppressive pretrial incarceration; (2) minimizing anxiety and concern of the accused and, most importantly, (3) limiting the possibility that the defense may be impaired. *Barker, supra,* 407 U.S. at 532, 92 S.Ct. at 2193. In this case, appellant was incarcerated from November 13 to December 21, 1978, when he was released to third-party custody. He was rearrested on February 9, 1979, and detained on two new charges until May 22, 1979, by which time both those charges had been dismissed. From May 22 until trial on December 12, 1979, appellant was held on bond from the charges in this case, his third-party custody having been revoked for failure to comply with the conditions of pretrial release. Thus, appellant was detained on the murder charge in this case for 8 of the 13 months between his arrest and trial.

Appellant contends that the prejudice from this 8 months' incarceration was heightened by the fact that he was being held solely because of testimony by one grand jury witness which was later found to have been perjured. Because it appears from the record that the government was not aware of any infirmity in this testimony before it dismissed the original indict-

ment and obtained a new one based on testimony of other witnesses, we find the prejudice from incarceration here to be no greater than that under usual circumstances.

As to appellant's interest in minimizing anxiety, appellant initially argues that "any young man" in his position would have been anxious during the delay. This is undoubtedly true, as *Barker, supra,* 407 U.S. at 534, 92 S.Ct. at 2194, recognized, yet it may not weigh heavily, *see id.* He argues that the fact that he chose to proceed to trial without a defense witness demonstrates that he was indeed suffering considerable anxiety because of the delay. While we agree that appellant's choice does evince some impatience at the delay, we note that it also indicates a confidence that the government would be unable to prove him guilty.[1] Other reasons also may have influenced appellant's decision. *See* discussion below of appellant's ineffective assistance argument.

Finally, appellant asserts that the delay impaired his defense because it resulted in his inability to obtain the testimony of Emanuel Gray. Appellant concedes that it is speculative whether Gray's presence could have been secured had trial begun sooner. Indeed, it appears that appellant would have had a better chance of obtaining Gray's testimony if he had agreed to a continuance.[2]

Aside from Gray's absence, appellant does not suggest that his defense was hindered by the 13-month delay between arrest and trial. Because appellant presented no witnesses and did not testify, any lapses of witnesses' memory occasioned by the delay would seem to have helped rather

---

1. When asked by the court why he wanted to go forward in the absence of a witness his attorney considered essential, appellant replied:

   Because I have been waiting this long, and from what ... I know, that I really didn't do this no way, so it doesn't really matter to me whether the witness is here or not. It is up to the DA to prove that I done this, I participated in this offense. Therefore, I just leave it upon the DA to prove that.

2. Gray was incarcerated in Virginia at the time of appellant's trial. Defense counsel had filed a writ of habeas corpus ad testificandum seeking Gray's presence at trial, but the Virginia authorities declined to produce Gray because of a state rule requiring 30 days' notice for such writs. *See* discussion below on ineffective assistance of counsel.

than hampered his defense. *See Barker, supra*, 407 U.S. at 532, 534, 92 S.Ct. at 2192, 2194.

▇ Balancing all these factors, as we must, *id.* at 533, 92 S.Ct. at 2193, we conclude that appellant was not denied his Sixth Amendment right to a speedy trial. Although chargeable to the government, the delay was due entirely to court congestion and routine processes. Appellant did expressly assert his right, but only shortly before trial. Finally, appellant did suffer some prejudice by reason of his 8 months' incarceration, but the significance of that is diminished by the fact that 6½ of the 8 months in jail were due in part to his own violation of the court's initial conditions of release. We find no other significant prejudice.

### III

Appellant also appeals from the trial court's denial without a hearing of his motion to vacate sentence pursuant to D.C. Code § 23–110 (1981). In that motion appellant alleged that his Sixth Amendment right to the effective assistance of counsel had been violated by trial counsel's failure to interview Emanuel Gray, to procure Gray's presence at trial, and, failing that, to take steps during trial to obtain Gray's testimony. We hold that the trial court erred in determining that the files and records conclusively showed that defendant was not entitled to any relief. *See id.* § 23–110(c). Accordingly, we remand for a hearing on appellant's allegations.

On Wednesday, December 12, 1979, when the case was called for trial, appellant's trial counsel notified the court that the Virginia corrections authorities had not honored the writ of habeas corpus ad testificandum directing that Emanuel Gray be produced from his place of incarceration in Staunton, Virginia, to testify in appellant's behalf. Motions were heard and the trial continued to Thursday, December 13. On Thursday morning trial counsel announced that, upon review of his records, he had determined that Gray was an "essential" witness without whom appellant would have no alibi defense. Counsel added that he had first learned of the refusal by Virginia authorities to produce Gray two nights before—presumably Tuesday, December 11. He said that despite his evaluation of the critical need for Gray's testimony, appellant wished to proceed to trial.

At counsel's suggestion, the trial court then questioned appellant as to the voluntariness of his decision. Appellant affirmed that he had been satisfied with counsel's representation so far, that he had discussed the situation with counsel and that it was his own decision to go forward without Gray. Appellant gave as his reasons the fact that he had been waiting "this long" and that he had decided to leave it to the prosecution to prove his guilt.

After further inquiry the court decided to proceed, apparently satisfied that appellant was making this decision intelligently and voluntarily. Appellant's counsel then asked for leave to withdraw, stating that without Gray's testimony he was "without a defense" and that going to trial would be "almost like suicide." Counsel said he had not been able to interview Gray because "I haven't been able to locate him until very recently." Counsel proffered that Gray would testify that when the shooting occurred he and appellant had been walking in that vicinity, about 50 to 100 yards away, and not right on the scene as the government contended. Counsel also stated that when appellant was free on bond, appellant had been told by members of Gray's family that Gray was "not desirous of becoming involved in this."

The trial court denied the motion to withdraw. Before the jury was empaneled the court suggested to appellant's counsel that he might wish "to utilize some of the rules of court that would permit a deposition of Mr. Gray, if he is not available."

At the end of the first day of trial, Thursday, December 13, the court again suggested to appellant's counsel that there

might yet be a way to obtain Gray's testimony:

THE COURT: Mr. Stowe, I gather you will continue in your efforts to locate or produce Mr. Gray, or in some alternative manner obtain his testimony.

MR. STOWE: It would be somewhat difficult to go to Staunton, Virginia, tonight. It's 120 miles from here, and I'm not sure that I can even have access to the Staunton Correctional Institution, or even have standing to seek to talk to Mr. Emanuel Gray there, as I am not his lawyer.

THE COURT: All right. I just remind you that that is an issue that still has some options for you.

On Friday, December 14, the government concluded its presentation of evidence. Appellant's codefendant put on two witnesses, and then trial was continued to Monday, December 17. On Monday, the codefendant put on one witness and rested. Appellant's counsel thereupon rested without putting on any evidence and without further mention of Emanuel Gray.

In May 1981 appellant filed his motion to vacate sentence. In its support he appended an affidavit that Emanuel Gray had given a Public Defender Service investigator following appellant's conviction. Gray's affidavit stated that on the day of Bottoms' murder, he learned that appellant had been robbed by two men in ski masks. Gray armed himself with a .22 caliber pistol and went out "to find out who robbed Willie."[3] After an unsuccessful search, he went to appellant's home, where he found appellant and appellant's mother. The mother said that Michael Miller had just run out of the house in a hurry.

In a little while, the affidavit continued, Gray and appellant went out. When they were just a few feet from the house, Gray heard shots but could not see where they had come from or who had fired them. He and appellant ducked behind a car. Gray pulled out his gun and held it in his hand

but did not fire it. Appellant had no gun with him, Gray stated. Although behind the car, Gray was able to raise his head enough to see Michael Miller standing over Bottoms, who was lying in the street. He saw Miller fire several shots directly into Bottoms. Gray estimated the distance from where he and appellant were to where Michael Miller was as he fired at Bottoms to be "about seventy or eighty feet."

After that, Gray and appellant ran through a nearby alley. Michael Miller was not with them then or at any time that Gray was with appellant that day.

Finally, Gray stated in the affidavit that he had never talked with appellant's trial counsel about the shooting. Because he knew that appellant "had nothing to do" with the shooting of Bottoms, Gray "would have been happy to testify in court or anywhere else if [he] were asked to do so."

Under D.C.Code § 23–110 (1981), a prisoner may move to vacate sentence at any time upon the grounds, *inter alia*, that his sentence was imposed in violation of the United States Constitution or is "otherwise subject to collateral attack." The trial court must hold a hearing "[u]nless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief." *Id.* § 23–110(c). This court has interpreted that clause to mean that an evidentiary hearing is required unless "the allegations of the motion itself are vague and conclusory, are wholly incredible, or, even if true, would merit no relief." *Gibson v. United States*, 388 A.2d 1214, 1216 (D.C.1978) (per curiam). *See also Pettaway v. United States*, 390 A.2d 981, 984 (D.C.1978). Because § 23–110 is virtually a remedy of last resort, any question whether a hearing is appropriate should be resolved in the affirmative. *Glass v. United States*, 395 A.2d 796, 809 (D.C.1978); *Gibson, supra*, 388 A.2d at 1216. Where the appellant alleges that the representation of his trial counsel was ineffective, the necessity for a hearing is in-

---

**3.** Although the evidence showed that two guns were used to kill Bottoms, both were .22 caliber.

creased because "the record on direct appeal is ordinarily barren of the evidentiary facts which would either confirm or refute that allegation." *Johnson v. United States,* 385 A.2d 742, 743 (D.C.1978); *Gibson, supra,* 388 A.2d at 1216.

Under the standard used in recent years in this jurisdiction, in order to prevail on a post-conviction claim of ineffective assistance, a prisoner had to demonstrate that his trial counsel was grossly incompetent and that as a result the essence of a substantial defense was blotted out. *Wesley v. United States,* 449 A.2d 282, 284 (D.C. 1982); *Angarano v. United States,* 312 A.2d 295, 298 & n. 5 (D.C.1973).

After submission of briefs and oral argument, however, the Supreme Court issued its opinion in *Strickland v. Washington,* —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in which the Court comprehensively surveyed the law on this subject and articulated the standards that henceforth will govern post-conviction ineffective assistance claims. We have considered the application of *Strickland* to the facts of this case and have determined that it does not alter our conclusion that a remand is required to afford appellant a hearing on his claim. Rather than discuss the *Strickland* formulation here, we choose to couch our discussion in the language employed by the trial court and the parties. We leave it to a future case to determine, upon full briefing by the parties, the extent, if any, to which the application of the *Strickland* standard may differ from our application of *Angarano*. *See generally Trapnell v. United States,* 725 F.2d 149, 153–54 (2d Cir.1983). The trial court, of course, should apply the *Strickland* formulation in considering this case upon remand.

We agree with the trial court's implicit ruling that the allegations are not vague or conclusory or wholly incredible. We therefore review the trial court's analysis of the third ground for denying a hearing—that even if true, appellant's contentions merit

no relief. The trial court was not persuaded that counsel was grossly incompetent. The court noted generally that counsel "investigated this case." More specifically, the court found that counsel "knew about Emanuel Gray and the family interest in not involving him" and that he "nonetheless took reasonable measures to secure his presence."

We conclude to the contrary that the record fails to establish conclusively that counsel was not grossly incompetent. In the first place, there was evidence in the record that counsel had known of Gray's existence for some time before trial. Counsel conceded that he had never interviewed Gray, offering as his excuse that he had been unable to locate Gray. However, the record shows that at least as of November 8, 1979, more than a month before trial, counsel knew that Gray was incarcerated at the Staunton Correctional Center in Virginia.

■ Counsel has an obligation to interview witnesses known to have knowledge of the crime with which the defendant is charged, at least where there is reason to believe the testimony will be favorable to the defense. *See Harris v. United States,* 441 A.2d 268, 273–74 (D.C.1982); *Johnson v. United States,* 413 A.2d 499, 503 (D.C. 1980). The government argues that here there was no need for counsel to interview Gray because counsel already knew the essence of Gray's testimony. The government also stresses that appellant himself chose to proceed in Gray's absence, thereby waiving his right to Gray's testimony. While counsel seemed aware of the general outlines of Gray's testimony, his failure to interview Gray may have rendered appellant's putative waiver invalid. Evidence in the record suggests that appellant may have believed that Gray would be an uncooperative witness.[4] On the present state of the record, we cannot tell whether that factor played any role in appellant's deci-

---

4. *See* Tr. 137–38. Appellant's counsel said that Gray's mother and sister had told appellant that

Gray did not want to become involved in the case.

sion. As noted above, Gray stated in his affidavit that he "would have been happy to testify" in appellant's behalf. If appellant was under a misapprehension as to how Gray would testify and if his decision to go to trial without Gray's presence was based on such a misapprehension, appellant was prejudiced by counsel's failure to interview Gray. But these, of course, are matters outside the present record that should be explored in an evidentiary hearing.

The trial court also found that counsel was not grossly incompetent in his efforts to secure Gray's presence at trial. Here, too, we find the record inadequate to determine the issue. Among the unresolved factual issues are how long defense counsel knew, or should have known, that Gray was incarcerated at Staunton; when a definite trial date was set; whether the amount of time before trial that counsel filed the writ of habeas corpus ad testificandum comported with the acceptable standard of practice for attorneys in this jurisdiction; whether there were any procedures in Virginia whereby the witness could have been produced on less than 30 days' notice, and whether counsel made any efforts to inquire about such emergency procedures.[5]

Perhaps the most significant omission in the record involves what, if anything, trial counsel did *during trial* to obtain Gray's testimony. As noted above, the trial court twice suggested to counsel that there might yet be a way he could secure Gray's evidence, referring in particular to the court's rules concerning the taking and introduction of depositions of unavailable witnesses. See Super.Ct.Crim.R. 15. However, the record does not reveal whether trial counsel made any efforts during trial to depose Gray or otherwise obtain his testimony.

The government argues that it could not have been gross incompetence to fail to depose Gray because Rule 15 allows for the taking of depositions only in "exceptional

circumstances" and that no such exceptional circumstances were present here. Without ruling on this question, we note that Super.Ct.Crim.Rule 15 allows the trial court considerable discretion in this area and that the trial court here had given some indication that it might view favorably a request for a deposition.

The last issue concerning counsel's competence on the matter of Gray's testimony involves appellant's purported waiver of Gray's presence at trial. The trial court held that appellant "knowingly and voluntarily waived his right to the testimony of Emanuel Gray." That broad ruling is not adequately supported by the existing record. First, as noted above, the fact that counsel had never interviewed Gray casts doubt on whether appellant's putative waiver could have been knowing and voluntary. Second, even if the record supported the conclusion that appellant waived any right to Gray's presence as of the time trial commenced, that did not constitute a complete waiver with respect to Gray's testimony. Certainly it could not be construed as a waiver of his right to the effective assistance of counsel. Appellant indicated that he was willing to forego Gray's testimony if the only alternative was another continuance. He never said he did not want counsel to continue efforts to secure Gray's testimony.

The correctness of this view of appellant's "waiver" is confirmed by the trial court's suggesting to counsel that there might still be ways of securing Gray's testimony, thereby implying that the court did not believe counsel was relieved of his obligation to adduce evidence favorable to his client's cause.

The trial court also held that, aside from the question whether there was gross incompetence in not securing Gray's testimony at trial, the absence of his testimony did not blot out the essence of a substantial defense. The trial court offered several

---

5. Appellant contended in his motion to vacate that the Virginia Deputy Attorney General had informed him that Virginia is "generally able to comply" with such a writ in a shorter period of time if the appropriate officials are apprised of an emergency situation. Motion at 11 n. 8.

reasons for this conclusion. First, the court noted that appellant could have presented essentially the same exculpatory testimony by testifying himself. In our view, however, this is not a proper basis for the court's holding. It amounts to an imposition of a penalty on appellant for exercising his Fifth Amendment right not to testify. *Cf. Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). Moreover, testimony from a third person such as Gray that appellant was not involved in the shooting would carry more weight than appellant's own uncorroborated assertion that he was not with his brother during the shooting.

The trial court also held that Gray's testimony, as proffered in Gray's affidavit, did not constitute a substantial defense.[6] The court noted that the proffered testimony would give appellant a motive for the homicide, establish a contact between him and his brother Michael, and place him at the scene of the murder. While we agree that in some respects Gray's proffered testimony would have corroborated government evidence, we note that in other respects it would have contradicted key government evidence. The facts alleged in Gray's affidavit set forth a complete defense to the theory that he acted as a principal. They also undercut the government's theory of appellant's participation in the murder as an aider and abettor.[7]

 We hold, then, that the trial court erred in not holding a hearing on appellant's § 23–110 motion alleging ineffective assistance of trial counsel. Accordingly, we remand the record to the trial court for a hearing on appellant's allegations.

*The judgment in No. 80–430 is affirmed.*

*The judgment in No. 82–1046 is reversed and the record is remanded for further proceedings consistent with this opinion.*

---

**6.** The trial court said that Gray's testimony "would not be likely to produce an acquittal if a new trial were granted." Our prior cases in this area do not require such a showing, however. *See, e.g., Asbell v. United States,* 436 A.2d 804, 810–11 (D.C.1981) (substantial defense blotted out where counsel failed to explore avenues of attacking government case that had "at least had some promise"; defense bears burden of showing that counsel's lapses "materially lessened the opportunity for acquittal"); *Johnson v. United States,* 413 A.2d 499, 505 (D.C.1980) ("[t]he loss of highly credible impeachment material, which *may* have been sufficient to cast a reasonable doubt on the government's evidence, blots out a substantial defense") (emphasis added). In a motion for a new trial alleging newly-discovered evidence, however, we have held that the movant must show, *inter alia,* that the new *evidence* "would probably produce an acquittal." *Woody v. United States,* 369 A.2d 592, 594

(D.C.1977); *Heard v. United States,* 245 A.2d 125, 126 (D.C.1968).

**7.** The government notes that Gray's proffered testimony might have incriminated him as a participant in Bottoms' murder because it indicated he had a motive (revenge), was present at the scene of the crime, and was armed with a pistol of the same caliber as the weapons used to kill the decedent. The government suggests that, if properly advised by independent counsel, Gray would have invoked his Fifth Amendment rights and declined to testify. We agree that that was and is a possibility. However, without holding a hearing, the trial judge could not have been sure that would happen. Indeed, the fact that Gray was willing to supply an affidavit may be some indication that he would have been willing to testify in appellant's behalf even in the face of possible self-incrimination.