**Michael L. NEWMAN and Delonte B. Samuels, Appellants,**

v.

**UNITED STATES, Appellee.**

Nos. 94–CF–1263, 96–CO–1061, 94–CF–1265.

District of Columbia Court of Appeals.

Argued Feb. 6, 1997.
Decided Aug. 7, 1997.
As Amended Sept. 9, 1997.

Peter H. Meyers, Washington, DC, appointed by this court, for appellant Newman.

Carol Garfiel Freeman, Rockville, MD, appointed by this court, for appellant Samuels.

Eumi Choi, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Thomas C. Black, and Elizabeth Trosman, Assistant United States Attorneys, were on the brief, for appellee.

Before FERREN and STEADMAN, Associate Judges, and KERN, Senior Judge.

FERREN, Associate Judge:

This case concerns primarily the following issues: as to appellant Samuels, whether the trial court erred in excluding extrinsic impeachment evidence tending to show that a key government witness was biased, and that someone other than Samuels committed the charged murder and related crimes; and, as to appellant Newman, whether the court erred in denying without a hearing his motion for a new trial based on alleged ineffective assistance of counsel.

Newman and Samuels were indicted for the June 18, 1993, murder of Rudy Williams during an attempted robbery of Williams and his two friends, Robert Harvey and Reuben Nicholas. The case first went to trial before Judge Alprin on February 28, 1994. Because of a juror's illness, the court declared a mistrial when the defendants refused to proceed with eleven jurors. The case was tried again before Judge Alprin on July 18–21, 1994, and on July 22, 1994, the jury found Newman and Samuels guilty of two counts of felony murder, D.C.Code § 22–2401 (1996 Repl.); second-degree murder, *id.* § 22–2403; first-degree burglary while armed, *id.* § 22–1801; armed robbery, *id.* § 22–2901; possession of a firearm during a crime of violence (PFCV), *id.* §§ 22–3202(a), –3204(b); and carrying a pistol without a license (CPWL), *id.* § 22–3204.[1] (They both were acquitted on charges of first-degree murder.) Newman and Samuels filed timely notices of appeal. In addition, Newman appeals from the denial, without a hearing, of his motion for a new trial based on ineffectiveness of trial counsel. *Id.* § 23–110. For the reasons elaborated below, we remand the case in Samuels' Appeal No. 94–CF–1265 for reconsideration of Samuels' proffered extrinsic impeachment evidence. We affirm Newman's conviction in Appeal No. 94–CF–1263, but we remand Newman's § 23–110 claim in Appeal No. 94–CO–1061 for a hearing on the alleged ineffectiveness of trial counsel.

## I. Facts

At trial, three eyewitnesses testified for the government: the two other victims (Harvey and Nicholas) and Theresa Hungerford. Harvey testified that he, Nicholas, and Williams had attended a picnic the day of the murder where they drank beer and brandy. After the picnic, the three went first to play lottery numbers and then to a liquor store to purchase more brandy. Williams and Harvey then followed Nicholas to the apartment of Sharon Bost, a prostitute Nicholas knew, to solicit sex. Bost asked the men for money to buy crack, which they provided. Bost then left to purchase the crack while the men remained to drink brandy. Bost returned, smoked the crack, then went into the back bedroom with Nicholas. While they were gone, Williams and Harvey smoked some of the crack. When Bost and Nicholas returned, Williams asked Bost if she had any friends. Bost left again, then returned in about ten minutes; the men continued drinking. Five minutes after Bost returned, Theresa Hungerford came to the apartment. Harvey and Hungerford went to the back room for fifteen minutes; they then returned to the main room where Bost, Williams, and Nicholas were waiting. After a conversation, Hungerford left angry. Ten minutes later, Hungerford returned and banged on the

---

1. On September 21, 1994, Judge Alprin sentenced each defendant to concurrent prison terms of 30 years to life for each felony murder, 15 years to life for the second degree murder, 10 to 30 years for the armed burglary, 10 to 30 years for armed robbery, 5 to 15 years for PFCV, and one year for CPWL. Newman was given an additional prison sentence of one to three years, also concurrent, under D.C.Code § 23–1328 (1996 Repl.) (penalties for offenses committed while on release awaiting trial).

door, demanding that Bost open it. Hungerford and two men then "bust[ed] in" to the apartment; the shorter and lighter complected of the two—identified by Harvey as Samuels—pointed a black revolver in Harvey's face. Harvey noted that the taller of the two was armed with a "silver gun." Someone said "give it up mother fucker!" and ordered the men to take off their shoes and socks. In response to further commands, Harvey and Nicholas emptied their pockets and threw the money on the floor in front of them. Hungerford, meanwhile, patted down Williams. Williams refused to cooperate and began to struggle with the taller gunman. Williams was shot. Hungerford and the gunmen immediately fled; and Harvey ran out of the apartment to find a policeman. Harvey could not identify Newman as the second gunman, although Harvey described that gunman as darker complected and taller than Samuels.

Harvey's identification of Samuels, however, was weakened by Harvey's initial failure to select Samuels (as well as Newman) out of a photographic array. Harvey testified that he did not identify Samuels until he observed Samuels' picture in a newspaper article identifying Samuels as a suspect in several murders, including the murder of Williams. Even then, however, Harvey testified that he was only "80 percent sure" of his identification. Harvey further testified that, when he identified Samuels at a lineup, he had been "85 percent sure" that he was identifying the man who shot Williams. Finally, Harvey testified that he had never seen either gunman before the robbery and that neither had used a name during the course of the robbery.

Nicholas testified in a substantially similar fashion. Unlike Harvey, he identified both Newman and Samuels as the two gunmen. While he admitted to drinking alcohol both before and after arriving at Bost's apartment, he denied giving Bost money for crack or ever smoking crack. Nicholas also testified that the robbers ordered them to "give it up" and commanded the men to remove their shoes, socks, and pants. Nicholas further testified that Hungerford took the money the men had thrown on the floor and took a $20

bill from Williams' pocket. Nicholas also agreed that one of the gunmen—whom he identified as Newman—was significantly taller and darker complected than the other. The government then requested that Newman and Samuels stand, so that the jury could see that Newman was significantly taller and darker complected than Samuels. Nicholas's identification testimony, like that of Harvey, was weakened by his failure to identify either Newman or Samuels when shown a photographic array several weeks after the shooting. When counsel for Samuels asked Nicholas on cross-examination whether he had seen Samuels' photograph in the newspaper before identifying Samuels in a lineup, Nicholas replied in the negative.

Theresa Hungerford testified pursuant to an agreement in which she pleaded guilty to armed robbery in connection with the June 18 incident and agreed to testify about it for the government in exchange for the government's agreement to drop any other charge or investigation pending against her. Hungerford identified Newman and Samuels as the two gunmen. Hungerford testified that she had come to Bost's apartment because Bost had told her that men were there who wished to exchange money for sex. According to Hungerford, all three of the men smoked crack with her. Hungerford then went to the window and called outside to Newman that men were inside who had money. She testified that she knew Newman sold drugs and that she therefore anticipated he would come to the apartment to sell drugs to the men. Hungerford further testified that someone identifying himself as "Jeff" knocked on the door several minutes later, and that she thought it was Newman with another drug user/dealer Hungerford knew as "Jeff." Instead, she said Newman and Samuels entered with guns and demanded that the men "give it up." Hungerford at that point decided to join the robbery. She rifled the men's pockets and looked over the items they threw on the floor, but she denied taking any money.

The government also presented the following physical evidence and related testimony. Michael Newman's wallet containing photo identification was recovered from the crime

scene. A Derringer pistol containing blanks also was recovered there, as was a spent bullet fired from a different weapon. The government called a weapons expert, who testified that the bullet was .38 caliber that must have been fired from a .38 special or from a .357 magnum. The government also introduced in evidence a silver gun with white handles found in Sharon Bost's apartment. A forensic expert testified that Rudy Williams died from a single gunshot wound.

Finally, the government called Officer Raymond Crawford, who had processed Newman after his arrest. Crawford testified that Newman spontaneously had remarked at the time: "You got the wrong one, just because my i.d. was found inside the house."

## II. Samuels' Impeachment Evidence

Newman and Samuels raise many allegations of error on appeal, three of which require detailed treatment. The first is Samuels' contention that the trial judge erred in refusing him permission to introduce evidence tending both to reveal Hungerford's bias against him—her motive to lie—and to show that another man, not Samuels, was among Hungerford's accomplices responsible for Williams' murder.[2]

### A. The Proffer

At the first trial, Samuels attempted to impeach Hungerford with an uncharged previous crime. According to the defense proffer, premised on a police report and on a victim's willing testimony, Hungerford committed a crime on June 3, 1993—just two weeks before the Williams shooting—similar to the crime at issue here. Specifically, Samuels proffered that Hungerford had asked a stranger named Keith Bego to buy her beer and then accompany her back to her godmother's apartment to drink. Once there, according to the proffer, Hungerford and several other friends drank with Bego and then asked him to buy them more liquor. At that point, according to Samuels, Hunger-

ford, assisted by two women friends and three male friends, attacked Bego while yelling "give it up." One of the three male assailants was significantly darker complected and taller than the other two. When Bego resisted and tried to flee, Hungerford stabbed him with a pair of scissors while one of the shorter males and the other women blocked his way and restrained him. The taller, darker complected man and the other shorter, lighter complected man stripped Bego of his shoes, socks, and pants, and then took his money. Finally, according to the proffer, the group gave Bego back his clothes and told him to go. Bego reported the incident to the police and led them back to the scene, where he identified Hungerford and—although he did not learn their names—the taller, darker complected man and the shorter, lighter complected man. Hungerford's other accomplices apparently had fled when the police arrived. Hungerford never was charged with this crime, and she received immunity from prosecution as a result of her plea agreement to testify in the present murder case.

Samuels supported his proffer with the police report of the incident, which had an extensive narrative of the June 3 crime consistent with Samuels' proffer. He also told the judge that Bego was available in court and would testify not only to the truth of the proffer but also to the fact that Samuels "definitely was not involved" in the earlier crime.

Samuels therefore proffered, by reference to the other, recent crime, that Hungerford had engaged in a pattern of setting men up and robbing them, as evidenced by the similarity of the two crimes. According to the defense theory, Hungerford worked with a group of accomplices, including two male accomplices who acted as her primary enforcers—one tall and dark complected, the other shorter and lighter complected—and these were the men who actually had shot

**2.** At trial, both Samuels and Newman pressed the evidentiary argument discussed in this part of the opinion. Unlike Samuels, however, Newman has not pressed the argument on appeal, except to say in his brief that he "adopts all relevant issues raised by" Samuels. As shall become evi-

dent, this issue cannot help Newman. For convenience, therefore, we limit our discussion to "Samuels'" proffer, although occasionally we note where Newman's, as well as Samuels', counsel contributed to the discussion.

Williams. Hungerford, according to Samuels, thus deliberately misidentified Newman and Samuels to protect her real accomplices—a classic case of a biased witness. Defense counsel also proffered that the evidence had another purpose: as "reverse" other crimes evidence to demonstrate that another person, not Samuels, had participated in Williams' murder.

The trial judge ruled, to the contrary, that the incident reflected by the proffer was collateral and went solely to Hungerford's credibility, not to bias. The judge also declined to consider the "reverse" other crimes theory. Finally, the judge expressed concern about holding "a trial within a trial" to get out the facts of the earlier crime—a distraction that would confuse the jury. The judge accordingly permitted Samuels to ask Hungerford about her involvement in the alleged June 3 robbery and to argue his theory to the jury; but the judge prohibited the use of extrinsic evidence of the June 3 crime, including Bego's testimony, to impeach Hungerford if she denied her involvement. After the court ruled, counsel for Samuels asked Hungerford about the June 3 robbery; Hungerford denied participating in any robbery of Keith Bego on June 3. She also denied identifying Samuels falsely to hide the identity of her true accomplice.

Samuels renewed his proffer before the same judge at the second trial and received the same ruling. Again, defense counsel asked Hungerford about her involvement in the alleged June 3 robbery, and again she denied that she ever had tried to rob Bego or that she falsely had identified Samuels to protect her true accomplice.

### B. Colloquy Among Court and Counsel

In order to understand clearly what issues emerged from the court's ruling, it is important to focus more precisely on the interchange between counsel and court after the defense completed its proffer that Hungerford had committed a similar crime just two weeks earlier, but with different accomplices.

[SAMUELS' COUNSEL]: And my position, our theory is, number one, she [Hungerford] in fact did set up the events with Sharon Bost, that she did it in conjunction with others, that she is not only lying about her own role but the role of others and that *she's identifying my client in order to protect the real person involved in this offense.*

. . . .

[PROSECUTOR]: Well, I would submit that the only reason that the earlier armed robbery can be questioned about is the possible bias. As specific[ally] we have a *Brown* [3]-*Beal[e]* [4] issue here.

THE COURT: *That's right.*

. . . .

[NEWMAN'S COUNSEL]: This is *Drew* [5] evidence.

THE COURT: Is she [Hungerford] on trial for something here? Is she on trial for something here?

. . . .

[PROSECUTOR]: It still comes back to the *Brown* and *Beal[e]* problem. She could have done a hundred other robberies. There is absolutely nothing to tie anybody involved in any other robbery with Ms. Hungerford to this case.

. . . .

[SAMUELS' COUNSEL]: *What I am trying to do is impeach her credibility* with respect to the issue that she identified my client because my client was involved in this case. *And I am trying to show that she has a motive for keeping out, just as she said my client came to her and threatened her, I am trying to show that she has a motive for minimizing her own conduct and keeping out information—and hiding information from the government and the jury of others who are involved.*

. . . .

THE COURT: Well, I think on the credibility issue, I think you have got a problem. If I let you ask her these ques-

---

3. *Brown v. United States,* 409 A.2d 1093 (D.C. 1979).

4. *Beale v. United States,* 465 A.2d 796 (D.C.1983).

5. *Drew v. United States,* 118 U.S.App. D.C. 11, 331 F.2d 85 (1964).

tions on credibility, I still view this matter as a collateral issue.

. . . .

[SAMUELS' COUNSEL]: *My understanding is that bias is not a collateral matter.*

THE COURT: You can call everything bias, that doesn't make it bias.

[SAMUELS' COUNSEL]: I understand. *It strikes me that her motivation to lie is directly an issue, that does constitute bias and that can be impeached by extrinsic evidence.*

. . . .

THE COURT: I will permit the question, but you are going to be stuck with the answer.

[SAMUELS' COUNSEL]: In order not to violate the ruling, I want guidance. I can ask the question as I indicated to the Court but I am stuck with the answer?

THE COURT: That's right.

[NEWMAN'S COUNSEL]: But that is the guts of what *Drew* is all about. You and I have litigated *Drew* many, many times.

THE COURT: Not with respect to witnesses.

[NEWMAN'S COUNSEL]: *Drew* applies to anybody who testifies.

THE COURT: Not here in this case, it isn't the law here.

(Emphasis added.)

When Samuels renewed the proffer the next day, adding that Keith Bego was present and willing to testify that Samuels definitely was not one of the men who had attacked him, counsel for Samuels elaborated his bias theory:

[SAMUELS' COUNSEL]: Again, Mr. Bego's testimony I think is directly relevant to her [Hungerford's] motivation to lie, to falsely implicat[e] my client in order to protect the people with whom she has engaged in virtually identical robberies just two weeks before.

Counsel for Newman then emphasized the similarity of the crimes and argued that they established a "modus operandi" for Hungerford, admissible under a "reverse *Drew*" theory.

[NEWMAN'S COUNSEL]: This is a classic [Federal Rules of Evidence] 404[/]608 evidence involving with—dealing with uncharged evidence of other crimes and uncharged misconduct. And whether the Government wants to bring in Mr. Harvey and Mr. Nicholas to see if they can identify these two [defendants], I have no problem with that. *But the jury has a right to know that this is her modus operandi, this is almost like a reverse Drew.*

The government argued that differences between the crimes negated such a showing and, in any event, that the previous robbery had no relevance to Hungerford's testimony about the June 18 robbery and murder. As indicated earlier, Judge Alprin agreed with the government, replying that he could "hardly think of a more collateral issue" and that to allow defendants to proceed would create "a trial within a trial."

### C. The Issues In General

Counsel were making two arguments: (1) that another recent, similar crime involving Hungerford—and involving accomplices other than Samuels and Newman—gave Hungerford a motive to lie to protect her accomplices, and thus she was a biased witness subject not only to cross-examination about the prior crime but also to impeachment with extrinsic evidence of it; and (2) that extrinsic evidence of this other crime also was admissible as "defensive" or "reverse" *Drew*[6] evidence, meaning that evidence of a recent, similar crime with a distinct modus operandi—which the defendant could be shown not to have committed—was admissible as tending to prove that someone other than the defendant committed the crime charged. *See Groves v. United States,* 564 A.2d 372, 378 n. 15 (D.C.1989), *amended,* 574 A.2d 265 (D.C.1990).

Akin to "defensive" or "reverse" *Drew* evidence—and sometimes properly characterized as a subset of such evidence—is so-

---

**6.** See *supra* note 5.

called *Winfield*[7] (formerly *Brown/Beale*)[8] evidence. *Winfield* evidence tends to show that someone other than the defendant was the real culprit. As elaborated below, *Winfield* evidence may, but does not necessarily, reflect that someone other than the defendant had committed another crime like the one before the court; but even when a prior crime is not involved, the evidence can be admissible because the proffered motive and opportunity to commit the crime are probative of criminality in the way that *Drew* or "reverse" *Drew* evidence is probative.

From the colloquy among court and counsel, it is clear that the prosecutor and the judge recognized that the defense proffer purported to embrace *Brown/Beale* (now *Winfield*) evidence, whereas defense counsel stressed the *Drew* terminology—perhaps because the proffer concerned a crime, not less culpable behavior as is sometimes proffered in a *Winfield* situation.

We believe it appropriate under the circumstances to analyze the defense proffer not only under the "bias" and "reverse" *Drew* headings but also under *Winfield*, since the trial judge recognized that such an issue (identified by the prosecutor as *Brown/Beale*) was in the case, and further because this court, sitting en banc, for all practical purposes folded *Winfield* evidence into the "reverse" *Drew* category. *See Winfield v. United States*, 676 A.2d 1, 4, 7 (D.C.1996) (en banc); *Morris v. United States*, 622 A.2d 1116, 1127 (D.C.1993). We turn first to bias, then to "reverse" *Drew/Winfield*.

### D. Bias

The trial judge erred in failing to recognize that the defense properly was proffering the June 3 robbery to show bias. Although defense counsel once said, "What I am trying to do is impeach her credibility," Samuels correctly claims on appeal that the defense proffer also sought to impeach Hungerford for bias—for a motive to lie to protect her real accomplices both from the earlier and from the present, more serious crime.

"[W]e require a foundation for the admission of extrinsic evidence to impeach a witness with bias," *In re C.B.N.*, 499 A.2d 1215, 1220 (D.C.1985), and thus counsel "must proffer facts sufficient to permit the trial judge to evaluate whether the proposed question is probative of bias," *Jones v. United States*, 516 A.2d 513, 517 (D.C.1986). Specifically, counsel "must proffer some facts which support a genuine belief that the witness is biased in the manner asserted." *Id.* (internal quotation marks omitted).

Samuels proffered a detailed version of a recent crime involving Hungerford, based on a police report and on Bego's ready testimony, that was similar in many, unusual details to the crime charged here *and* included the victim's—Bego's—word under oath that Samuels had not been involved. If credible, Bego's testimony would allow the jury to draw a rational inference that Hungerford was biased, i.e., had a motive to lie, because of her fear that, if Samuels and Newman were not convicted, the authorities likely would infer and eventually prove that, given the similarities of the two crimes, Hungerford's actual male associates (whom she wanted to protect) had committed both the June 3 and the June 18 offenses—including, now, a murder.

When defense counsel cross-examines a government witness for bias, counsel is not limited to accepting the witness's answer, as the trial judge required of Samuels here; "while a witness may be impeached for bias by cross-examination, he [or she] can also be so impeached by character evidence, conduct, prior conviction, etc.," i.e., by extrinsic evidence. *Bassil v. United States*, 517 A.2d 714, 717 (D.C.1986). The trial judge's failure to permit the proffered, extrinsic evidence here was error.

### E. "Reverse" Drew/Winfield

We are satisfied that Samuels' proffer also put forward "defensive" or "reverse" *Drew* evidence. *See Morris*, 622 A.2d at 1127; *Groves*, 564 A.2d at 378 n. 15. The June 3 and 18 incidents were similar enough to each

---

7. *Winfield v. United States*, 676 A.2d 1 (D.C.1996) (en banc).

8. See *supra* notes 3, 4.

other to suggest reasonable inferences that Hungerford had the same male accomplices on both occasions, and that because Samuels (according to Bego) was not present on June 3, he was not involved on June 18.

The Supreme Court of New Jersey noted almost two decades ago that "[i]t is well established that a defendant may use similar other-crimes evidence defensively if in reason it tends, alone or with other evidence, to negate his guilt of the crime charged against him." *State v. Garfole,* 76 N.J. 445, 388 A.2d 587, 591 (1978) (remanding for determination of whether to admit four episodes of child molesting similar to fifth episode for which defendant was charged, where defendant had alibi for all but two episodes). The court added that other crimes evidence offered by the prosecution requires for admission "a fairly rigid standard of similarity," to be sure the defendant is not convicted for mere propensity to commit crime; but, "when the defendant is offering that kind of proof exculpatorily, prejudice to the defendant is no longer a factor, and simple relevance to guilt or innocence should suffice as the standard of admissibility, since ordinarily, and subject to rules of competency, an accused is entitled to advance in his defense any evidence which may rationally tend to refute his guilt or buttress his innocence of the charge made." *Id.* The defense-proffered Bego testimony, therefore, was eligible for admission under ordinary defensive "other crimes" (*Drew*) analysis, as elaborated by the New Jersey Supreme Court.

Before *Winfield,* however, this court had not expressly embraced "defensive" or "reverse" *Drew* theory in general. *See, e.g., Morris,* 622 A.2d at 1127; *Groves,* 564 A.2d at 378 n. 15; *Gates v. United States,* 481 A.2d 120, 125 (D.C.1984). In *Winfield,* moreover, we dealt with a particular species of "reverse" *Drew* evidence which had received considerable attention in other cases and ap-

parent tight restriction on admissibility. We therefore turn to *Winfield* to inform the "reverse" *Drew* application here.

For years, this court applied the rule that, "before evidence of the guilt of another can be deemed relevant and thereby admissible, the evidence must *clearly link* the other person to the commission of the crime." *Brown v. United States,* 409 A.2d 1093, 1097 (D.C.1979) (emphasis added); *accord Beale v. United States,* 465 A.2d 796, 803 (D.C.1983). Later, in *Johnson v. United States,* 552 A.2d 513 (D.C.1989), this court announced that the "clearly link" test meant "proof of facts or circumstances which tend to indicate some reasonable possibility that a person other than the defendant committed the charged offense." *Id.* at 516; *accord Freeland v. United States,* 631 A.2d 1186, 1189 (D.C. 1993).

Despite *Johnson,* however, there was confusion as to whether "clearly link" suggested a standard of relevance stricter than the standard employed in other contexts.[9] Recently, therefore, in *Winfield,* we took occasion to announce en banc that "there is only one standard of relevance," 676 A.2d at 3, that set forth in *Punch v. United States,* 377 A.2d 1353 (D.C.1977): "that which tends to make the existence or nonexistence of a fact more or less probable than would be the case without the evidence," *id.* at 1358, *quoted in Winfield,* 676 A.2d at 4. We then reaffirmed *Johnson*'s formulation: the proffered evidence need only " 'tend to indicate some reasonable possibility that a person other than the defendant committed the charged offense.' " *Winfield,* 676 A.2d at 4 (quoting *Johnson,* 552 A.2d at 516). Furthermore, because "[t]he 'focus' of the standard is not on the third party's guilt or innocence, but on 'the effect the evidence has upon the defendant's culpability,' " it follows that " '[t]here is no requirement that the proffered evidence must prove or even raise a strong probability

9. At one point in the colloquy among counsel and the court, counsel for Samuels appeared to begin arguing for admissibility under *Brown /Beale,* saying that he realized "the case law is fairly strong against me," but that he thought the proffered evidence was "also relevant on the issue that other people, the people who are involved in the other case—well, never mind." If

we were to speculate, we would surmise that counsel felt deterred by the *Brown /Beale* "clearly link" formulation that may have appeared to suggest that counsel had to proffer the name of the third party, other than Samuels, who allegedly committed the previous crime with Hungerford—a name not known to counsel.

that someone other than the defendant committed the offense.'" *Id.* (second alteration in original) (quoting *Johnson,* 552 A.2d at 517).

On the other hand, we cautioned "that a defendant's proffer of evidence that other individuals had even stronger motives to murder the victim than the accused [is] insufficient, *without more,* to establish the [required] link to the offense charged." *Id.* at 5 (alterations and emphasis added by original) (internal quotation marks omitted). Thus, "the trial judge ordinarily may exclude evidence of third-party motivation unattended by proof that the party had the practical opportunity to commit the crime, including at least inferential knowledge of the victim's whereabouts." *Id.*

Finally, we emphasized in *Winfield* that a determination that particular evidence is relevant "does not exhaust the trial judge's responsibility in deciding whether to admit it. The judge must also balance the probative value of the evidence against the risk of prejudicial impact," including the risk of jury confusion from a "trial-within-a-trial" that could result from admitting the proffered evidence followed by government "rehabilitative" evidence. *Id.* (internal quotation marks omitted).

In adopting *Johnson*'s "reasonable possibility" formulation (while expressly discarding the "clearly linked" language), *see Winfield,* 676 A.2d at 3, 4, we compared the test for relevance with "the roughly reverse situation where the government seeks to introduce proof of other criminal acts by the defendant," *id.* at 4, citing *Drew.* Accordingly, we said as a general rule that if other prescribed limitations on admissibility are met (e.g., probative value outweighs prejudicial impact), the type of evidence admissible under *Winfield* as tending to show a third party committed the crime charged against the defendant is akin to the kind of evidence admissible under *Drew* as tending to prove the defendant committed "other crimes" or bad acts. If a prior crime, in other words, were similar enough to the present crime for admissibility *against* the defendant under *Drew* to show identity, for example, it should be admissible *for* the defendant under *Winfield* when that evidence tends to indicate someone else was the culprit in a recent, similar crime and thus likely was involved, rather than the accused, in the present crime. As we summarized:

> [E]vidence of the type appellant seeks to admit here—recent assaults against the victim stemming from identical motivation—has been considered highly probative by this court *in the reverse setting of admission of "other crimes" evidence to support guilt. Unduly restricting admission of third-party perpetrator evidence would raise concerns of unequal treatment.*

*Winfield,* 676 A.2d at 7 (emphasis added) (citations omitted). We therefore now commonly refer to *Winfield* (formerly *Brown–Beale* ) evidence as a species of "reverse" *Drew* evidence.[10]

■ We stressed in *Winfield* that "the trial court must resolve close questions of admissibility in this setting in favor of inclusion, not exclusion," 676 A.2d at 6, because a defendant's constitutional right of " 'a meaningful opportunity to present a complete defense' " is implicated, *id.* at 7 (quoting *Crane v. Kentucky,* 476 U.S. 683, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986)). As to the present case, while there were differences between the June 3 and June 18 crimes, there also were similarities sufficient for us to be confident that, if the situation were presented under *Drew,* a trial judge very likely would admit the "other crimes" evidence under the identity or the common scheme exception. The crimes took place only two weeks apart. *See Gates,* 481 A.2d at 123 (affirming government use of other crimes evidence where similar robberies/sexual assaults occurred nineteen days apart). They concerned similar modes of operation in that Hungerford initially socialized, and attempted to negotiate a transaction, with the victims—possibly ascertaining that they had money—before attempting a robbery. *See id.* at 122 (noting that robbery turned into

---

**10.** Although the trial took place before our decision in *Winfield,* the government conceded at oral argument that *Winfield* applies in this case.

*See Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987).

sexual assault in charged and uncharged crimes); *Bartley v. United States*, 530 A.2d 692, 696 (D.C.1987) (concluding that government established similar modus operandi when robbers showed preference for supermarkets in same chain). And, in both cases, the robbers required the victims to remove their shoes, socks, and pants and told them to "give it up." *See Cox v. United States*, 498 A.2d 231, 238 (D.C.1985) (concluding that similar instructions to each victim and similar means of tying victim with clothing to prevent escape supported admissibility under *Drew*). Finally, for admissibility the crimes need not be identical if "the totality of the circumstances demonstrates a reasonable probability that the same man attacked both complainants." *Cox*, 498 A.2d at 238.

In translating *Drew* analysis to the "reverse-*Drew*" context, it is important to note that the present case is not the kind where the defense points to another person who has a motive and practical opportunity to commit the crime. Here, but for the proffer that Bego would testify unequivocally that Samuels was not involved in the June 3 robbery, Hungerford's June 3 accomplices—whose descriptions matched appellants—could just as well have been Newman and Samuels. Put another way, but for Bego's proffered testimony exculpating Samuels, the government arguably could have used the June 3 incident as *Drew* evidence inculpating both appellants.

For this reason, Newman can get no benefit from the proffer (as his counsel on appeal appears to recognize, see *supra* note 2). But Samuels' case is different. By proffering Bego's testimony that Samuels was not present on June 3, that potential *Drew* evidence was converted, powerfully, into "reverse-*Drew*" evidence in his favor. By thus assuredly demonstrating a "reasonable possibility" that someone other than Samuels committed a similar crime with Hungerford on June 3, Samuels proffered evidence that—especially because it connects Hungerford with an assailant other than Samuels—"tend[ed] to create a reasonable doubt that [Samuels] committed the offense." *Winfield*, 676 A.2d at 4 (internal quotation marks omitted). Put in terms of the applicable standard

of relevance, Bego's proffered testimony "tend[ed] to make the existence ... of a fact"—Samuels' alleged presence at Williams' robbery/murder—"less probable" because of evidence tending to show he was not Hungerford's accomplice in a similarly executed crime two weeks earlier.

■ As we have indicated, the fact that Samuels could not proffer the identity of the person who Bego said was "not Samuels" may go to the weight of the proffered evidence but not to its admissibility. *See id.* at 5–6.

■ The trial judge, therefore, not only erred in failing to recognize that Samuels' proffer went to Hungerford's bias, not merely to her credibility, but also erred in declining to find the proffered extrinsic *Winfield* ("reverse" *Drew*) evidence relevant to Samuels' defense. In reviewing the admission of evidence for abuse of discretion, however, we must inquire not only whether the judge erred in the ruling but also whether the error was of a magnitude requiring reversal. *See (James W.) Johnson v. United States*, 398 A.2d 354, 366 (D.C.1979).

### F. Harmless Error: Standard and Application

Particularly because the government's three eyewitnesses—Harvey, Nicholas, and Hungerford—all identified Samuels as a participant on June 18, the centerpiece of Samuels' defense was his proffered impeachment of Hungerford with evidence tending to show, by reference to the recent and similar June 3 incident, that someone other than Samuels had committed the crime on June 18. The trial judge did allow Samuels' counsel to ask Hungerford about the alleged June 3 incident, but, because the judge would not allow impeachment with extrinsic evidence, Hungerford's denial was the end of counsel's impeachment effort.

The attempt to impeach Hungerford with extrinsic evidence of bias, which was cut off entirely, went to "the core of the defense." *Stack v. United States*, 519 A.2d 147, 151 (D.C.1986). The court's error, therefore, was of constitutional magnitude violating Samuels' Sixth Amendment right to confront gov-

ernment witnesses—if the proffer of Bego's testimony was credible. *See Delaware v. Van Arsdall,* 475 U.S. 673, 678–80, 106 S.Ct. 1431, 1434–36, 89 L.Ed.2d 674 (1986); *Jenkins v. United States,* 617 A.2d 529, 531–34 (D.C.1992); *Stack,* 519 A.2d at 151, 154. "Strictly speaking, the judge here did not curtail cross-examination; rather [ ]he restricted extrinsic testimony." *C.B.N.,* 499 A.2d at 1221. Nonetheless, "because the purpose of admitting the extrinsic evidence is the same as cross-examination," the same harmless error test applies. *Id.; accord Clark v. United States,* 639 A.2d 76, 81 (D.C. 1993) ("Where, for example, the trial court's evidentiary ruling wholly deprived the defendant of any opportunity to cross examine a witness *or present evidence concerning bias or a central issue in the case,* we may only affirm if we are convinced that the error was harmless beyond a reasonable doubt...." (emphasis added)).

 Likewise, as we previously have indicated, the failure to admit "reverse-*Drew*" evidence will be subject to constitutional harmless error analysis if the evidence goes "to the heart of the defense theory." *Stack,* 519 A.2d at 154.[11] Hungerford was a key government witness, particularly in light of Harvey's and Nicholas' failure to identify Samuels before the appearance of a newspaper article picturing Samuels and identifying him as a suspect in the murder of Williams. Her credibility, therefore, was a "central issue" in the case, and, for that reason, we must examine the exclusion of extrinsic evidence of her bias for constitutional error. *See C.B.N.,* 499 A.2d at 1221; *United States v. Hudson,* 970 F.2d 948, 955 (1st Cir.1992) (finding constitutional error where court excluded proffered extrinsic testimony of defense witness regarding bias of key government witness).

 Because Samuels' proffer of extrinsic evidence both to impeach Hungerford for bias and to show a reasonable possibility that someone else committed the crime implicated both "the right of confrontation and the right to present a defense," *Bassil,* 517 A.2d

at 716, we are satisfied that the constitutional harmless error standard applies here. Our next step, therefore, is to determine whether the exclusion of the proffered evidence was harmless beyond a reasonable doubt. *See Van Arsdall,* 475 U.S. at 680–81, 684, 106 S.Ct. at 1435–36, 1438; *Jenkins,* 617 A.2d at 532–34; *Stack,* 519 A.2d at 154; *C.B.N.,* 499 A.2d at 1221.

If Bego's testimony conforms with the proffer, we cannot find exclusion of that proffered evidence harmless beyond a reasonable doubt as to Samuels on this record; we cannot say that a jury necessarily would believe only the inculpatory evidence as to Samuels—the eyewitness testimony of Hungerford, Harvey, and Nicholas—rather than Bego's *Winfield* evidence tending to prove that someone other than Samuels committed both crimes. Although both Harvey and Nicholas identified Samuels in the June 18 incident, there was testimony that they both had been smoking crack and drinking brandy at the time. In addition, both men had failed to identify Samuels until after his picture had appeared with a newspaper article identifying him as a suspect in the Williams murder. Finally, the proffer itself would impeach Hungerford. The jury, therefore could have discounted the identification testimony of all three witnesses. Furthermore, there was no physical evidence—such as a wallet, as in Newman's case—to locate Samuels at the crime scene on June 18; there was no inculpatory statement by Samuels, as there arguably was by Newman; and there was no testimony by Hungerford indicating she had known Samuels (as she had known Newman) before the June 18 murder. Accordingly, it would be for the jury, not this court, to decide what evidence was credible; and, if Samuels' proffer were to hold up—to have substance—he would be entitled to reversal and a new trial.

## G. Remand

 What disposition, therefore, is required? We have said that defendants "are entitled to have the trial judge exercise ...

---

11. On at least one occasion, however, we have used a "substantial prejudice[ ]," *Freeland,* 631 A.2d at 1194, or nonconstitutional harmless error, standard to reverse the trial court's failure to allow in *Brown–Beale* evidence that went to "the heart of [the] defense," *id.* at 1195.

discretion unfettered by erroneous legal thinking." *Wright v. United States*, 508 A.2d 915, 919 (D.C.1986). Therefore, unless on a particular record the trial judge would have "but one option," *id.* at 920 (internal quotation marks omitted), we must remand for reconsideration of the ruling under the proper standard. *See id.* at 919–20; *Collins v. United States*, 596 A.2d 489, 494 (D.C.1991); *Ibn–Tamas v. United States*, 407 A.2d 626, 636 n. 17 (D.C.1979); *(James W.) Johnson*, 398 A.2d at 363. In this case, we cannot say as a matter of law that the trial judge had "but one option": to admit Samuels' proffered extrinsic evidence. Because the trial judge did not believe he had discretion to admit the evidence for bias and "reverse" *Drew* purposes, he did not exercise the kind of discretion to which the defense and the government both were entitled.

Furthermore, even though we conclude that Samuels' proffer—if the evidence supports it—indicates admissibility of the Bego testimony and related evidence, the fact is that we do not have the benefit of the trial judge's perceptions about the reliability of that proffer, since the judge did not examine Bego out of the jury's presence or otherwise probe Samuels' extrinsic evidence to ensure that Bego would, in fact, testify in accordance with the proffer. Such scrutiny of the proffer would have been a perfectly proper—and, on this record, probably an indispensable—step before any court could say the bias and "reverse" *Drew* (*Winfield*) evidence at issue here should, or should not, have been admitted.

■ In evaluating the reliability of the proffer, however, the court must not seek to evaluate the reliability of the *witness. See Martin v. United States*, 606 A.2d 120, 129 (D.C.1991) ("[T]he question of [the excluded witness's] credibility was for the jury, not the judge."). As the Supreme Court has warned:

We cannot speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted this line of reasoning had counsel been permitted to fully present it. But we do conclude that the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [the witness's] testimony which provided a crucial link in the proof of petitioner's act.

*Davis v. Alaska*, 415 U.S. 308, 317, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974) (internal quotation marks and ellipsis omitted); *accord Martin*, 606 A.2d at 129; *King v. United States*, 550 A.2d 348, 356–57 (D.C.1988). We remand, therefore, for the trial court to determine whether Bego's actual testimony sufficiently matches the defense proffer so that his testimony tends to make the existence of Hungerford's motive to lie, and the likelihood that her alleged accomplice from the June 3 robbery actually committed the offense, more probable than if the evidence were not presented. *See Winfield*, 676 A.2d at 4.

■ Although the trial court's inquiry into the nature of Bego's testimony is limited, there is a second inquiry the trial court must undertake if it does conclude that Bego's testimony reasonably matches the defense proffer. As the court made clear in *Winfield*, a trial judge must weigh the probative value of the proffered evidence against the possibility of jury confusion if the defense evidence, coupled with the government's rebuttal, would become a distracting mini-trial. *See id.* at 5. Although the trial judge did express concern that the proffered evidence could lead to "a trial within a trial," he did not rule it out on that basis and, more importantly, did not consider it with reference to the constitutionally based policies favoring admission of such evidence when relevant to presenting " 'a complete defense'." *Winfield*, 676 A.2d at 7 (quoting *Crane*, 476 U.S. at 690, 106 S.Ct. at 2146). Furthermore, the trial court did not consider the deleterious effect on the defense of allowing the defendant to ask questions regarding bias, but refusing to allow the defendant to show the jury the basis for this line of questioning. *See Davis*, 415 U.S. at 318, 94 S.Ct. at 1111 (concluding that because defendant could not demonstrate underlying reason for bias theory, "the jury might well have thought that defense counsel was engaged in a speculative and baseless line of attack"); *see also Van Arsdall*, 475 U.S. at 687–88, 106 S.Ct. at 1439–40 (Marshall, J. dissenting) (discussing importance of cross-examination); *Scull v.*

*United States,* 564 A.2d 1161, 1166 (D.C. 1989) (concluding that inability of counsel to cross-examine regarding witnesses' own fear of prosecution forced defendant to tie questions to "dubious theory" without apparent support).

Accordingly, we remand the case to the trial judge for a hearing on whether Samuels' proffered but previously rejected evidence should be admitted. In exercising that discretion the court should evaluate whether the evidence available is in keeping with the proffer and whether its probative value outweighs the hazard of jury confusion. The court also should keep in mind several policy considerations that pertain particularly to "reverse" *Drew* evidence.

First, this is not like the typical *Drew* situation where there is a concern that admission of other crimes evidence for the government will unfairly imply that the defendant is a "bad person" with a propensity to commit crime. In the "reverse *Drew*" situation here, the only concern is admission of "marginally relevant evidence creating the danger ... [of] distract[ing] the jury from the issue in this case." *Winfield,* 676 A.2d at 5; *see Garfole,* 388 A.2d at 591. Second, the defendants obviously have a strong constitutional interest in " 'a meaningful opportunity to present a complete defense,' " *Winfield,* 676 A.2d at 7 (quoting *Crane,* 476 U.S. at 690, 106 S.Ct. at 2146)—an interest substantially more significant than any problem likely to be caused by jury confusion over admission of the evidence.[12] Finally, it would appear, as a general rule, that if the evidence *could* have been admitted in a standard *Drew* context, it presumptively *should* be admitted in a "reverse *Drew*" context.

On remand, the trial court shall decide, after an appropriate hearing, whether Samuels' proffered bias and *Winfield* ("reverse" *Drew* ) evidence should have been admitted.

If the court says "no," Samuels' convictions shall stand affirmed—subject, of course, to his right to appeal the court's ruling. If the court says "yes," then it shall order a new trial for Samuels. Although we have concluded, on the basis of Samuels' proffer, that the court's errors were not harmless, the court is free on remand, if it decides again to exclude the proffered evidence, to find facts that bear on harmlessness. *See Davis v. United States,* 564 A.2d 31, 41–42 (D.C.1989) (en banc).

### III. Newman's Ineffectiveness of Counsel Claim

◼ After his conviction, Newman filed a motion for a new trial alleging constitutional ineffectiveness of his trial counsel. Newman asserted in his motion—and attached a signed affidavit to the same effect—that he had told counsel about an alibi witness, a Ms. Catina Henson, but that his attorney had failed to contact Henson. Newman also said in his motion that he had been at Bost's apartment earlier on the day of the crime and at that time had left his wallet there by accident.[13] Newman attached to the motion a signed affidavit by Henson stating that Newman had been with her at her home—a significant distance from the murder scene—from approximately six or seven in the evening until about midnight on the day the crime occurred. Because the murder took place at approximately 8:30 to 9 p.m., Henson's testimony—if believed—would have completely exonerated Newman. Henson added in her affidavit that, to the best of her knowledge, Newman's trial attorney had not tried to contact her.

The motions judge[14] denied the motion without a hearing and without calling for an answer from the government. In his order denying the motion, the motions judge noted that even if Newman's allegation that his attorney had not contacted Henson was true,

---

**12.** In *Winfield,* we "cautioned against excessive mistrust of juries in the evaluation of relevancy," and stressed that, although "the trial court retains broad discretion to prevent the *cumulation* of third-party perpetrator evidence, sifting the relevance of that evidence is largely about drawing commonsense inferences from uncomplicated facts, something we regularly entrust to juries." *Winfield,* 676 A.2d at 7 (internal quotation

marks omitted); *accord Feaster v. United States,* 631 A.2d 400, 409 (D.C.1993).

**13.** Newman's attorney briefly alluded to this explanation in his closing argument to the jury.

**14.** Judge Alprin, who presided over both of Newman's trials, was also the motions judge.

Henson had not explained the presence of Newman's wallet at the scene. The judge said "it is highly unlikely that Ms. Henson would leave out such important information in her affidavit." Finally, according to the judge, because Henson could not explain away the government's "overwhelming evidence," Newman could not show prejudice from his attorney's failure to contact Henson.

■ We have said many times that "where the court is faced with a claim of ineffective assistance of counsel, the [statute] creates a presumption that a hearing should be held, *Bruce v. United States,* 617 A.2d 986, 995 (D.C.1992); *Sykes v. United States,* 585 A.2d 1335, 1339 (D.C.1991), especially where the allegations of ineffectiveness relate to facts outside the trial record." *Hollis v. United States,* 623 A.2d 1229, 1232 (D.C. 1993); *accord Gray v. United States,* 617 A.2d 521, 523 (D.C.1992); *Smith v. United States,* 608 A.2d 129, 131 (D.C.1992); *Pettaway v. United States,* 390 A.2d 981, 983–84 (D.C.1978). "[A]ny question regarding the appropriateness of a hearing should be resolved in favor of holding a hearing." *Gillis v. United States,* 586 A.2d 726, 728 (D.C. 1991) (per curiam).

■ We have stressed the importance of this rule because § 23–110 "is virtually a remedy of last resort" and "the record on direct appeal is ordinarily barren of the evidentiary facts which would either confirm or refute [the] allegation [of ineffective assistance of trial counsel]." *Miller v. United States,* 479 A.2d 862, 869–70 (D.C.1984) (internal quotation marks omitted). We therefore will affirm the trial court's denial of a § 23–110 motion without a hearing only if the claims (1) are "palpably incredible"; (2) are "vague and conclusory"; or (3) even if true, do not entitle the movant to relief. *Gregg v. United States,* 395 A.2d 36, 39 (D.C.1978).

We have held, moreover, that where "[t]he exculpatory value of the evidence proffered by appellant turns at bottom on the credibility of the ... witnesses specifically identified in [the] § 23–110 motion and whose proposed testimony was evidenced by signed statements[, w]e can discern no grounds for negating the credibility of those witnesses merely on the basis of their written statements." *Rice v. United States,* 580 A.2d 119, 122–23 (D.C.1990). To do so "assume[s] the answer to the very question which an evidentiary hearing could illuminate." *Id.* at 123.

In *Rice,* for example, we specifically declined to hold that, "as a matter of law, the evidence of appellant's guilt was so strong that there can be no reasonable probability that the exculpatory evidence[,] ... whatever its strength, could have raised a reasonable doubt in the minds of the jurors." *Id.* Indeed, we have consistently held that credibility determinations cannot be based on affidavits or countered by conclusory statements but may be resolved only by recourse to a full evidentiary hearing. *See Hollis,* 623 A.2d at 1233 (concluding that affidavit submitted by attorney that he had a reason not to call potentially exculpatory witness because he believed defendant had threatened witness did not negate affidavit submitted by witness that he would have testified willingly); *Gillis,* 586 A.2d at 728–29 (concluding that statement by attorney at defendant's sentencing that attorney had "reasons" for not calling exculpatory witnesses was insufficient to deny § 23–110 motion without hearing); *Miller,* 479 A.2d at 870–71 (noting that evidence that witness might have been reluctant to testify or would have given testimony contrary to affidavit must be explored at hearing, not determined based on record); *Samuels v. United States,* 435 A.2d 392, 395 (D.C.1981) (per curiam) (concluding that hearing was necessary to resolve whether defendant instructed attorney to file appeal, despite attorney's affidavit to the contrary).

Nor can we say that the government witnesses provided such overwhelming evidence of Newman's guilt that a hearing on Henson's credibility was not necessary. Three witnesses identified Newman as someone present at the scene of the crime, but two of these witnesses admitted they had smoked crack cocaine and drunk alcohol immediately before the robbery, and there was testimony that the third had done so as well. One of the witnesses, Theresa Hungerford, was severely impeached with evidence of her plea bargain, prior convictions, and previous inconsistent statements. The other two—the complaining witnesses—had failed to identify

either defendant from a photographic array. And, only after a newspaper article about the murder had appeared did they identify Newman and Samuels as the assailants. If the jury had received the benefit of Henson's alibi testimony that Newman had been with her elsewhere at the time of the shooting, therefore, it might have resolved the conflicts between Newman's and the government's versions of events in Newman's favor. *See Hollis,* 623 A.2d at 1233; *Gray,* 617 A.2d at 524 (concluding that hearing was necessary to determine whether trial counsel investigated witness who would have contradicted government's witness regarding defendant's presence at scene of crime); *Byrd v. United States,* 614 A.2d 25, 30–32 (D.C.1992) (finding counsel ineffective for failing to call exculpatory witnesses); *Smith,* 608 A.2d at 131–33 (concluding that hearing was necessary when attorney failed to contact or call witnesses who would have impeached government witnesses even if any individual witness could not have entirely confirmed defendant's version of incident); *Rice,* 580 A.2d at 123.

Contrary to the motions judge's ruling, moreover, the presence of Newman's wallet at the scene of the crime does not negate the exculpatory testimony of an alibi witness as a matter of law. Trial counsel told the jury in closing argument that "there's no evidence to show that [Newman] wasn't there earlier in the day," and that "[t]he only other person that would have known that is the woman who hasn't testified and that's Sharon Bost." See *supra* note 13. Furthermore, we cannot know whether, if Henson had testified, Newman himself would have taken the stand to present his explanation about the wallet. *See Byrd,* 614 A.2d at 31 (finding attorney deficient for failing to call witnesses, thereby forcing defendant to choose between testifying or presenting no defense); *Miller,* 479 A.2d at 872 (same). While the jury might have found this proffered explanation—that Newman happened to come by the apartment on the very day of the murder and accidentally left his wallet there—too incredible to

believe, it also could have found the combination of an alibi witness and the defendant's version of how the wallet got there believable. *See Byrd,* 614 A.2d at 32. Without a hearing to assess the credibility of the witness, however, we cannot tell what a jury might have done. *See Rice,* 580 A.2d at 122–23. As we have said before, where credibility issues are concerned, "live testimony[,] under oath[,] is key here." *Samuels,* 435 A.2d at 395.

Finally, we cannot agree with the motions judge that "it is highly unlikely that Ms. Henson would leave out such important information [as to how Newman's wallet innocently came to be at the crime scene] in her affidavit." While Henson's failure to mention the wallet might affect her credibility, it does not as a matter of law make her testimony incredible—even if only because there is no discernible reason why Henson could have been expected to know anything about Newman's wallet. *See, e.g., Ramsey v. United States,* 569 A.2d 142, 148–49 (D.C.1990) (concluding that trial court may consider silence and delay as affecting credibility, but these factors do not themselves render claim incredible and thus subject to denial without a hearing). In any event, the jury might have believed Henson despite the presence of the wallet; without a hearing to assess her credibility in the context of the other evidence, we cannot tell. Therefore, because the record here is "barren of the evidentiary facts which would either confirm or refute [the] allegation" that Newman's attorney failed even to attempt to contact a potential alibi witness, Newman is entitled to a hearing on his § 23–110 motion. *Miller,* 479 A.2d at 870 (internal quotation marks omitted).

■ In so ruling, we do not address the merits of Newman's claim. *See Gray,* 617 A.2d at 524. We decide only that, once a movant makes a colorable claim which, if true, would provide a basis for relief, the trial court should not decide the matter summarily.[15] *See Ramsey,* 569 A.2d at 147–49. Ac-

---

15. As already noted, the motions judge did not ask for a response from the government. It is possible that a case might arise where such a response would obviate the need for a hearing, particularly if not challenged by the movant.

The government, however, does not provide even now a response that would negate need for a hearing. The government's sole argument on appeal is that the motions judge correctly ruled that no witness, however credible, could over-

cordingly, we remand Newman's new trial motion in Appeal No. 96–CO–1061 for a hearing under D.C.Code § 23–110.[16]

## IV. Police Misconduct

 Before the first trial, the defense moved for dismissal with prejudice because of police misconduct. Newman and Samuels alleged that Sergeant Joseph P. Thomas, a police officer involved in the case, had initiated a sexual relationship with Bost during the investigation of the case. The trial court held a hearing on the allegations.[17] After listening to testimony from Thomas and Bost, the judge concluded that, even if the alleged events were true, there were no grounds to dismiss the indictment. The judge also ruled that, if Sharon Bost were to be called as a witness, the defense would have the right to cross-examine her about possible bias resulting from the relationship. Although both the government and Newman each expressed interest at various times in calling Bost to testify, neither side called her as a witness at either trial.

Appellants argue that the police misconduct in this case, "tampering" with a witness by initiating a sexual relationship after the investigation began, is so outrageous that it warrants dismissal of the indictments with prejudice under a cited general supervisory power of this court over the administration of criminal justice. See, e.g., In re F.G., 576 A.2d 724, 725 & n. 1 (D.C.1990) (en banc) (holding under general supervisory power that defendants may demand hearing on show-up identifications as matter of right and citing cases of previous use of court's supervisory powers); In re Kelley, 433 A.2d 704, 707 (D.C.1981) (en banc) (requiring under "inherent supervisory power over the Superior Court" that government must show probable cause before grand jury may subpoena defendant to appear in lineup). Assuming for the sake of argument that we could use our supervisory power for such a purpose, we see no basis for doing so here. If the allegations are true, there is no indication that the prosecution acquiesced in the conduct or sought to use the alleged relationship between Bost and Sgt. Thomas either as an investigative tool or as a means of depriving appellants of Bost's testimony. See United States v. Cuervelo, 949 F.2d 559, 567 (2d Cir.1991). Nor was the alleged police behavior, however inappropriate, the kind that "shocks the conscience" and, as a consequence, deprived the defendants of due process. See Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952).

come the weight of the government's case—an argument we reject.

16. Our dissenting colleague opines that, by remanding Newman's new trial motion for a hearing under D.C.Code § 23–110, we effectively have dictated a result in his favor. That is not true. As Judge Kern himself recognizes, we have said only that if the jury had heard the alibi testimony, it "might" have resolved the testimonial conflicts in Newman's favor. Post at 267. Our point, very simply, is that on the record here, see supra note 15, until the trial judge actually hears the proffered alibi testimony from the witness herself, together with any government attacks on her credibility by way of cross-examination or otherwise, the judge will not be in a position to make the determination that even if such evidence had been presented, there is not a reasonable probability that the outcome would have been different.

Judge Kern also suggests, without citation to authority, that Newman should have expressed his dissatisfaction with counsel during the colloquy with the court at trial as to whether Newman wished to waive his right to testify, "rather than wait[ing] nineteen months" to do so. Post at 267; see Boyd v. United States, 586 A.2d 670, 678–79 (D.C.1991). This implied requirement that Newman raise the issue on his own, during discussion of an unrelated subject—and while represented by counsel—in effect would eliminate the § 23–110 proceeding; anyone who failed to object during trial to counsel's handling of the case would thereby waive any right to protest later. In Miller, in an opinion Judge KERN joined, this court rejected the idea, advanced by the dissent here, that a willingness to proceed without a witness waives a defendant's right to allege deficiency under § 23–110 based on counsel's failure to investigate or call the witness. See Miller, 479 A.2d at 871–72. Furthermore, in Ramsey, we explicitly rejected the idea that a § 23–110 claim could be waived by a mere "lapse of time and prejudice to the government." 569 A.2d at 148. Finally, in Shepard v. United States, 533 A.2d 1278, 1280–82 (D.C. 1987), we announced that the time for bringing an ineffectiveness claim is during the pendency of the direct appeal.

17. Bost had identified the defendants in a lineup and through a photo array, and she had testified for the government before the grand jury.

In sum, because Bost never testified and because in any event there is no evidence that the government exploited her relationship with Sgt. Thomas, we find no error based on alleged police misconduct.

## V. Evidentiary Sufficiency

■ Newman and Samuels also make a number of arguments challenging sufficiency of the evidence. "So as not to displace the role of the jury, [we] must review the evidence in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence." *Curry v. United States*, 520 A.2d 255, 263 (D.C.1987). Nor is the government required to negate every possibility of innocence. *See Irick v. United States*, 565 A.2d 26, 30 (D.C.1989). Under this deferential standard, we conclude that none of defendants' sufficiency claims has merit.

### A.

■ Appellants argue that the government failed to prove the crime took place in a "dwelling, or room used as a sleeping apartment," as required by the burglary statute, D.C.Code § 22–1801(a) (1996 Repl.). *See Jennings v. United States*, 431 A.2d 552, 554–55 (D.C.1981). Although there was testimony that Bost, Hungerford, and a third prostitute named "Melinda" used the residence for prostitution at various times, there also was testimony that the apartment belonged to Bost, as well as testimony by Hungerford denying that she ever had practiced prostitution at the apartment. Furthermore, the three men found Bost in the apartment without any pre-arrangement and without any indication that she was soliciting prostitution from the location. A reasonable jury, therefore, could have inferred that the apartment was Bost's "sleeping apartment" and not merely a base for prostitution.

### B.

■ Appellants also maintain that the government failed to prove the "taking" and "asportation" elements of robbery. *See* D.C.Code § 22–2901 (1996 Repl.); *Lattimore v. United States*, 684 A.2d 357, 359 (D.C. 1996) (noting that District of Columbia robbery statute retains common law elements including "felonious taking" and "asportation [or carrying away]" (alteration in original) (internal quotation marks omitted)). According to the government's evidence, appellants ordered the victims to throw their money on the floor under clear threat of violence, and the victims complied. This was enough to demonstrate both a violent taking of the property by depriving the victims of its use and appellants' constructive control over the property to the detriment of its owners. *See id.* at 360 (concluding that control was established by pistol-whipping victim and ordering victim to hand over wallet); *Giles v. United States*, 472 A.2d 881, 884 (D.C.1984) (concluding that elements of robbery were satisfied when victim "was violently prevented from exercising possession over her property").

■ The minimal movement of the property—throwing the money to the floor at appellants' direction—satisfies both the taking and the asportation requirements. *See Lattimore*, 684 A.2d at 360 n. 4 (citing cases holding that victim's placing item in particular location on instruction of defendant satisfies taking and asportation requirements, even where defendant never touched item); *Simmons v. United States*, 554 A.2d 1167, 1171 n. 9 (D.C.1989) (noting that asportation element would be satisfied by minimal movement of victim's purse from shoulder down arm, even if defendant had fled empty handed). Although Newman and Samuels never touched the money, they exercised constructive possession through their "ability to exercise control ... and to guide its destiny." *White v. United States*, 647 A.2d 766, 767 (D.C.1994) (per curiam); *see Burnette v. United States*, 600 A.2d 1082, 1083 (D.C. 1991) (per curiam) (describing elements of constructive possession). Accordingly, the evidence supported the armed robbery convictions.[18]

---

18. We note there was testimony that Hungerford took money from Williams' shirt pocket, for which Newman and Samuels could be held accountable as aiders and abettors.

## C.

■ Appellants argue, next, that there was insufficient evidence that the unrecovered gun was a "pistol"—i.e., that the barrel was less than twelve inches long. As a result, they say, the CPWL charge is unsupported by sufficient evidence. They are wrong. In addition to eyewitness testimony describing the missing gun as a pistol, the government introduced evidence that the murder weapon was not the gun recovered but was a small caliber gun, such as a .38 special or a .357 magnum. Furthermore, a gun matching the description of the missing gun—with a barrel under 12 inches in length—was found in Newman's apartment and admitted as evidence. From all this evidence the jury reasonably could have found that the gun was less than twelve inches long.

## VI. Reasonable Doubt Instruction

■ Appellants' final argument focuses on the trial judge's reasonable doubt instruction. They argue that the judge impermissibly departed from the language prescribed in the standard criminal jury instructions and that their convictions, accordingly, must be reversed.

At both trials, the court gave the following instruction over the objections of defendants:

Reasonable doubt, as the name implies, is a doubt based on a reason, a doubt for which you can give a reason. It is such a doubt as would cause a juror, after careful and candid and impartial consideration of all the evidence, to be so undecided that he or she cannot say that he or she is firmly convinced of the defendant's guilt.

However, it is not a fanciful doubt, not a whimsical doubt, nor a doubt based on conjecture. It is a doubt which is based on reason. The government is not required to establish guilt beyond all doubt or to a mathematical certainty or to a scientific certainty. Its burden is to establish guilt beyond a reasonable doubt.

This instruction differs from the standard reasonable doubt instruction in two ways. It substitutes the phrase "firmly convinced" for "abiding conviction" and omits the words "such a doubt as would cause a reasonable person to hesitate or pause in the graver or more important transactions of life." *See* Criminal Jury Instructions for the District of Columbia, No. 2.09 (4th ed.1993). We addressed in *Butler v. United States*, 646 A.2d 331 (D.C.1994), *cert. denied*, 514 U.S. 1009, 115 S.Ct. 1326, 131 L.Ed.2d 206 (1995), the very instruction given here and concluded that the instruction was permissible despite the changes from the standard instruction. *See id.* at 338. We therefore sustain the instruction used here.

* * * * *

The case reflected in Samuels' Appeal No. 94–CF–1265 is remanded for a hearing on Samuels' proffered bias and *Winfield* ("reverse" *Drew*) evidence. We affirm Newman's conviction reflected in Appeal No. 94–CF–1263.[19] We reverse the denial of Newman's new trial motion under D.C.Code § 23–110 without a hearing, and remand the case in Appeal No. 96–CO–1061 for the required hearing.

*So ordered.*

KERN, Senior Judge, dissenting:

Upon the particular facts of the instant case, I am unable to agree with the majority's conclusions (1) remanding appellant "Newman's § 23–110 claim in Appeal No. 94–CO–1061 for a hearing on the alleged ineffectiveness of [his] trial counsel" and (2) that "[o]n remand, the trial court shall decide, after an appropriate hearing, whether [appellant] Samuels' proffered bias and *Winfield* ('reverse' *Drew*) evidence should have been

19. Because there can be only one murder where there is one body, and because the underlying felony will merge with the remaining felony murder, we remand Newman's conviction to the trial court for the limited purpose of merger and resentencing. *See Whalen v. United States*, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980); *Byrd v. United States*, 510 A.2d 1035 (D.C.1986)

(en banc). Similarly, in the event that the trial court rules on remand of Samuels' case that the proffered bias and *Winfield* (reverse *Drew*) evidence should not have been admitted, with the result that Samuels' conviction stands affirmed (subject to the right of appeal), see *supra* Part II., the trial court shall revisit Samuels' convictions for merger and resentencing.

admitted." With all deference, I believe that the majority's conclusions trivialize the trial court's role in the administration of justice in this jurisdiction and muddle the law of evidence in the trial of criminal cases in this jurisdiction, all to the detriment of its citizens.

The majority's welter of words tends to obscure the uncomplicated but nonetheless horrifying crime that occurred on the night of June 18, 1993, in Southeast Washington when Robert Harvey, Rudy Williams, and Reuben Nicholas, co-workers and friends, visited the apartment of Sharon Bost, a friend of Mr. Nicholas. They socialized and Ms. Bost invited Theresa Hungerford to join them in her apartment. Later, Ms. Hungerford left but returned in about ten minutes and called to Ms. Bost to be let in. When the latter opened the door, Hungerford entered together with two men, later identified as appellants Newman and Samuels, who *each* carried a pistol and who *both* demanded that the three visitors give up their money. When one of them, Rudy Williams, resisted this robbery, wrestled with appellant Newman and wrested the pistol he was carrying from his hand, Newman called on appellant Samuels "to shoot the pistol." Samuels fired *his* pistol at Williams, killing him. Hungerford, who later pleaded guilty, participated in the removing of money from the victims during the robbery.

At the trial in July 1994, the substance of the prosecution's case against appellants consisted of testimony by the two friends of the decedent who survived the armed robbery, Mr. Harvey and Mr. Nicholas, and the accomplice of appellants, Ms. Hungerford, who had pleaded guilty to a reduced charge arising out of the robbery-murder in exchange for her testimony against appellants. Thus, the jury heard from all three witnesses that the robbery and murder occurred; from Hungerford and Harvey that appellant Samuels was one of the two gunmen; and, from Hungerford and Nicholas that appellant Newman was the other gunman. In addition, the prosecution also introduced into evidence before the jury the wallet of appellant Newman which Mr. Nicholas found on the floor next to the body of Rudy Williams who

had struggled and then been killed for his resistance to the robbers.

Although appellants did not take the stand, defense counsel at trial were scarcely inert. They sought by cross-examination to show that Messrs. Harvey and Nicholas were too addled by the liquor and drugs they had consumed during their socializing in Bost's apartment prior to the attack and too frightened by the violence and suddenness of this attack to identify accurately Newman and Samuels as their two attackers.

The defense counsel in their cross-examination of the prosecution witness Hungerford brought out her unsavory past (*i.e.*, a drug addict who supported her habit by prostitution and theft as well as a participant in this particularly brutal crime) and her present desire to provide the "quid" of her testimony for the "quod" of the government's acceptance of her plea to a less serious crime than the murder and related felony charges that appellants Samuels and Newman faced. Nevertheless, the jury found appellants guilty, slightly more than a year after the murder of Rudy Williams.

In February 1996 (some nineteen months after the trial), appellant Newman filed a motion pursuant to D.C.Code § 23–110 to vacate his judgment of conviction, asserting that his trial counsel had been constitutionally ineffective because counsel had failed to "interview, or subpoena" a Ms. Catina Henson about whom he alleged he had told counsel at the time of his trial. Appellant Newman attached to his motion to vacate sentence an affidavit by Ms. Henson consisting of three sentences that stated in essence that he had been at her home during the time of the offense in June 1993.

The trial court, in denying this motion, pointed to "the government's overwhelming evidence against [appellant Newman]" and concluded that even if defense counsel should have presented to the jurors the putative witness' statement that appellant was with her in June 1993, rather than in Southeast Washington robbing the three victims and murdering one of them, Rudy Williams, there was not a reasonable probability that the jury would have found appellant not guilty.

The majority, unlike the trial court, did not hear the witnesses' testimony and observe the jurors. Nevertheless, it proceeds on the basis of the cold record to conclude that *it* cannot "say that the government witnesses provided such overwhelming evidence of Newman's guilt that a hearing on Henson's credibility was not necessary." The majority, without hearing the testimony, speculates on the lack of credibility of the prosecution's witnesses and then concludes that "[i]f the jury had received the benefit of Henson's alibi testimony that Newman had been with her elsewhere at the time of the shooting . . . it might have resolved the conflicts between Newman's and the government's versions of events in Newman's favor."

The majority, not content with speculating away the prosecution's live witnesses, then proceeds to explain away the presence of the wallet of appellant Newman which the surviving victim Nicholas found next to his murdered friend Williams by referring approvingly to defense counsel's closing argument to the jury that "there's no evidence to show that [Newman] wasn't there earlier in the day." [1] Moreover, the majority speculates further that "we cannot know whether, if Henson had testified, Newman himself would have taken the stand to present his explanation about the wallet."

Thus, the majority, having effectively diminished the strength of the government's case by *its* reading of the record and having speculated on the strength of the potential defense case with the addition of the alibi witness' testimony, now remands appellant Newman's motion to the trial court for a hearing under D.C.Code § 23–110. But what is the trial court's role in such a hearing now given the majority's (1) express conclusion that the prosecution witnesses did *not* present overwhelming evidence of guilt; (2) assertion that if the jury had heard the alibi witness presented by appellant Newman nineteen months after his trial, it "might have resolved the conflicts [in testimony] . . .

in Newman's favor;" (3) citation with apparent approval of appellant Newman's jury argument that he might have been in Ms. Bost's apartment earlier in the day of the murder and dropped his wallet *then;* and (4) theorizing that had the alibi witness testified, after all, appellant Newman himself then may well have taken the stand and explained away the presence of his wallet at the death scene?

The Supreme Court has stated in claimed ineffective assistance of counsel cases that "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984).

The trial court, having presided over *two* trials of this case, had obtained a particularly thorough understanding of the prosecution and defense cases. It certainly could take into account the fact that appellant Newman was proffering an alibi witness in February 1996, some thirty-two months after the crime, twenty months after the first trial, and nineteen months after the second trial. Moreover, at *this* trial the court had even entered into a direct colloquy in open court with appellant Newman about his taking the stand, and Newman replied, "Man, come on, let's get it over, you know what I'm saying, ain't got no win, man, let's do it, I understand all that, Your Honor." The court, as an experienced and astute observer of the trial, could well have wondered why appellant Newman did not in response to the court shout out: "I'm innocent, I have a witness, I told my lawyer," rather than wait nineteen months before filing a three-sentence statement bereft of details that placed Newman somewhere else on the night in question.[2] Moreover, the trial court could assess quite well the impact upon the jury of such an alibi

---

1. It defies logic that five persons partying in Ms. Bost's apartment for some hours *before* the robbery and the murder would *not* have noticed the wallet of appellant Newman.

2. I do not suggest, as the majority asserts, that appellant Newman "waived" his rights. Rather, the trial court could consider in determining the credibility of his post-trial assertion that he had had the opportunity to tell the court about his alibi witness and failed to do so.

in the face of the considerable testimony and the physical evidence the prosecution presented to the jurors that Newman had lost *his* wallet while the victim Williams lost *his* life.

In sum, given the vague and conclusory nineteen-month late alibi witness and the trial court's assessment that the jury would not have been swayed by it in the face of the strong physical evidence and the impactful eyewitnesses,[3] I believe that we should accept the trial court's measured confidence in the outcome of this trial.

The majority's conclusion with respect to appellant Samuels' claim of error on the part of the trial court is also an exercise in sheer speculation. At trial, Samuels attacked the credibility of the two witnesses who identified him as the gunman who shot and killed Rudy Williams in June 1993. As to the witness Mr. Harvey, the defense sought to discredit him because of his drinking liquor and ingesting crack cocaine during the socializing that preceded the robbery of him and the murder of his friend, Williams. As to the witness Hungerford who pleaded guilty to a lesser charge and agreed to testify, the defense attack was on her general credibility. She was asked about her addiction to drugs and how she supported her addiction by prostitution and petty theft. The defense also emphasized to the jury that she had herself aided the defendants in their murderous robbery. It was in this context of an attack upon her credibility that defense counsel asked if she had committed a robbery some two weeks before, and she answered in the *negative.*

Defense counsel then sought permission to impeach in two different ways her denial of having committed the robbery she had denied committing on a different date and at a different place: first, by the proffer of a complaint form filled out by a police officer based upon an account of this prior event by a witness named Bego, which complaint (a) had *not* led to any arrest; and (b) did *not*

identify any person except Hungerford; and, second, by the proffer of Bego himself as a witness.

Defense counsel proffered that Bego would testify: that some two weeks prior to the robbery and murder *being tried* the witness Hungerford approached him in a liquor store and asked for a ride to her godmother's apartment; he agreed, and when he drove her to her destination she invited him into the apartment, and he accepted her invitation; that there were other men *and* women in the apartment, and she and he went into the bedroom where they drank liquor and discussed having sex; that they disagreed about how much he would pay for her sexual favors; and, as he left the room, several persons in the apartment grasped him, Hungerford threatened him with a pair of scissors, and they took his wallet and made him remove his shoes to make sure he was not hiding money there before he was allowed to leave and return to his car. Bego went immediately to the nearest police precinct and a police officer returned with him to the apartment. Bego identified Hungerford as the woman who had attacked him, but no arrest was made. Moreover, the complaint form the police prepared and filed reflected that *no other person* who had been on the scene was identified.

Counsel explained to the trial court that his proffer of the complaint form and Bego was to demonstrate that Hungerford harbored a *bias* against appellants based upon (a) this counsel's assertion that *she* had knowledge that two men other than appellants had robbed Williams, Harvey, and Nicholas and then killed Williams; and (b) this counsel's assertion that as a consequence she was determined to "pin" these two crimes upon appellants so as to protect the "real" culprits. However, counsel conceded that he could not identify any of the persons allegedly present with Hungerford and Bego, and, as noted, the police complaint form did not identify any person other than Hungerford. Defense counsel did make the further

---

3. For example, the trial court could gauge quite well the impact upon the jury of the testimony by the witness Harvey that after appellant Samuels had held a gun to his head, he had a *very* clear recollection of him. When asked on redirect examination, "Why was it you were focused on the gunman that had the gun trained on you?," Harvey answered, "Because I didn't know if he was going to blow my head off or not."

proffer that Bego could testify that appellant Samuels was *not* among the persons in the apartment of Hungerford's godmother two weeks *before* the instant crime.

The trial court refused, in my view quite correctly, to admit either the police report or the testimony of Bego because the proffered evidence had no relevance to the case being tried to the jury and would only confuse the jurors by bringing into dispute before them who had robbed Bego some two weeks earlier when they were being asked to determine who robbed Williams, Harvey and Nicholas and then shot Williams to death.

The majority speculates that in light of the defense proffer of Bego's complaint that the witness Hungerford invited him to her godmother's apartment and then took money from him forcibly, she may have indeed committed the Bego robbery she denied committing. The majority then conjectures that the Bego crime was so "similar" to the instant crime that some of her many cohorts in the Bego crime *may* have been her two companions in the instant crime rather than appellants Newman and Samuels. Thus, the majority, piling conjecture upon speculation, reaches the conclusion that the trial court erred in refusing to allow Bego to testify (a) that Hungerford had picked him up, offered him sex for money, and then, wielding a pair of scissors, joined with other unidentified persons in taking his money, and (b) that appellant Samuels was *not* among those unknown persons joining her in her criminal act.

This court has held that "evidence of motivation of a third party to commit the crime charged risks distracting the jury from the issue of *this* defendant's guilt or innocence, and in applying the relevance standard the judge may properly take account of the danger." *Winfield v. United States,* 676 A.2d 1, 3 (D.C.1996) (en banc). We specifically noted the need for *"exclusion* of evidence that 'is too remote in time and place, completely unrelated or irrelevant to the offense charged, or too speculative with respect to a third party's guilt.'" *Id.* at 5 (emphasis add-

ed). The trial judge properly exercised his "full authority to prevent this sort of trial-within-a-trial." *Id.*

Defense counsel, by his proffer of the witness Bego, obviously would distract the jury from determining appellants' guilt into considering whether Hungerford, who was not even a party in the case at trial, had committed a crime against Bego of a quite different nature, at a different place, and at a different time than the crime at issue in the instant trial.[4] Counsel also sought to have Bego tell the jury considering *this* crime that appellants did *not* commit the first crime, but this, of course, had no relevance to the crime at trial. However, "we require a *foundation* for the admission of extrinsic evidence to impeach a witness with bias," and counsel "must proffer facts sufficient to permit the trial judge to evaluate whether the proposed question is *probative* of bias." *In re C.B.N.,* 499 A.2d 1215, 1220 (D.C.1985); *Jones v. United States,* 516 A.2d 513, 517 (D.C.1986) (emphasis added). In sum, the majority constructs a potential defense for appellees and then chides the trial court for its failure to recognize and then act upon this manufactured defense.

Words written by the much respected appellate judge, Ruggero Aldisert in *Washington v. Philadelphia Cty. Ct. of Common Pleas,* 89 F.3d 1031, 1044–45 (3d Cir.1996), seem most appropriate here:

At bottom, this case is about whether an appellate court appreciates the allocation of competence between trial courts and reviewing courts.... We must be vigilant of this court's increasing proclivity to deny substituting its judgment for that of the district court, but then to proceed with the tack that it expressly renounces.

Judge Aldisert further states:

Indeed, there are several reasons why district judges are much more capable of exercising broad discretion. They are on the scene. They smell the smoke of battle.... We should not construct obstacles to its use in the form of artificial standards

4. I cannot imagine that the trial court could properly approve of a prosecutor's proceeding under *Drew* to introduce into evidence against

Hungerford—had she chosen to go to trial rather than plead guilty here—the testimony of Bego concerning her alleged crime against him.

and criteria, the breach of which we deem an abuse of ·discretion as a matter of law, thereby creating a philosophical oxymoron by savaging traditional notions of discretionary powers.

*Id.* at 1049.

Judge Aldisert quotes approvingly, *id.* at 1048–49, from "America's premier federal courts expert," Charles Alan Wright, who wrote, "Every time a trial judge is reversed, every time the belief is reiterated that appellate courts are better qualified than trial judges to decide what justice requires, the confidence of litigants and the public in the trial court will be further impaired. Under any feasible or conceivable system, our trial courts must always have the last word in the great bulk of cases," and Judge Aldisert goes on to cite the much respected academic· observer, Professor Maurice Rosenberg, who has set forth, among other reasons,·for appellate courts to defer to trial courts in the exercise of discretion during trial

the superiority of his [or her] nether position. It is not that he [or she] knows more than his [or her] loftier [brothers and sisters]; rather [the trial judge] sees more and senses more. In the dialogue between the appellate judges and the trial judge, the former often seem to be saying: You were there. We do not think we would have done what you did, but we were not present and we may be unaware of significant matters, for the record does not adequately convey to us all that went on at the trial. Therefore, we defer to you.

*Id.* at 1049.·

Accordingly, I dissent from the majority's creation in the instant case of artificial standards and criteria and imposition of them upon the trial court which clearly saw more and sensed more than does the majority upon a cold record. I think that the majority's decision impairs the confidence of litigants and the public in the trial court, all to the detriment of the community.